[923 NE2d 1123, 896 NYS2d 735]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VINCENT FIAMMEGTA, Appellant.

Argued January 12, 2010; decided February 16, 2010

## POINTS OF COUNSEL

*Appellate Advocates,* New York City (*Lynn W.L. Fahey* of counsel), for appellant. The court denied appellant due process when it refused him a further chance in a treatment program and sentenced him to prison without holding a hearing or otherwise resolving disputed allegations, based on hearsay and conjecture, that he was responsible for thefts within the program. (*People v Selikoff,* 35 NY2d 227; *Matter of Chaipis v State Liq. Auth.,* 44 NY2d 57; *People v McConnell,* 49 NY2d 340; *People v White,* 32 NY2d 393; *Gagnon v Scarpelli,* 411 US 778; *Morrissey v Brewer,* 408 US 471; *Torres v Berbary,* 340 F3d 63; *Gardner v Florida,* 430 US 349; *People v Hansen,* 99 NY2d 339; *People v Outley,* 80 NY2d 702.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Morgan J. Dennehy* and *Leonard Joblove* of counsel), for respondent. The Supreme Court conducted a sufficient inquiry before determining that defendant had violated the terms of the plea agreement. (*People v Outley,* 80 NY2d 702; *Gardner v Florida,* 430 US 349; *People v Valencia,* 3 NY3d 714; *People v Naranjo,* 89 NY2d 1047; *Torres v Berbary,* 340 F3d 63; *People v Bing,* 76 NY2d 331; *People v Taylor,* 9 NY3d 129; *People v Kin Kan,* 78 NY2d 54; *McMillan v Pennsylvania,* 477 US 79; *United States v Watts,* 519 US 148.)

## OPINION OF THE COURT

Read, J.

In January 2006, defendant Vincent Fiammegta was arrested and charged with two counts each of second-degree burglary,

third-degree burglary, second-degree criminal trespass, third-degree criminal trespass, fourth-degree criminal mischief, fifth-degree criminal possession of stolen property, and petit larceny. The charges were based on allegations that he broke into two apartment buildings in Brooklyn and stole items from one of them. According to the presentence report, defendant admitted his guilt and explained that he had been "high on [Xanax], ambien[ ] and crack cocaine" at the time.

On May 10, 2006, the judge was informed that the prosecutor had approved defendant to participate in the Kings County District Attorney's Drug Treatment Alternative-to-Prison Program (DTAP), which offers substance abuse treatment in lieu of prison to nonviolent, drug-addicted felons who face a mandatory prison sentence under New York's second felony offender law. That same day, defendant was adjudicated a predicate felon, and pleaded guilty to one count of second-degree burglary. In return, the People agreed to dismissal of the indictment once defendant successfully completed an 18-to-24-month residential drug treatment program and aftercare, to be followed by reentry into the community. The judge advised defendant that if he did not satisfactorily finish the program, he would be sentenced to eight years in prison and five years of postrelease supervision.

Defendant entered a residential drug treatment program soon thereafter. By letter dated September 13, 2006, however, the program's Assistant Director of Clinical Services informed Supreme Court that defendant was at risk of discharge, essentially for violating conduct rules and displaying an uncooperative attitude. Consequently, at defendant's court appearance the same day the judge warned that "[t]his is not working," referring to defendant's participation in DTAP. When defense counsel asked the judge to give her client a second chance, he agreed to consider the request, and adjourned the case until September 27, 2006. At that time, a representative of Treatment Alternatives for Safe Communities (TASC) informed Supreme Court that defendant had been cleared to enter a residential drug treatment program at another facility later that day. TASC, a federally funded statewide agency that operates under the auspices of the Division of Probation and Correctional Alternatives and works in conjunction with DTAP, places defendants in treatment programs, monitors their progress, and

acts as a liaison between the programs and the court. The judge advised defendant that he would "take another chance" on him, and give him this one "last chance."

On March 15, 2007, the TASC Program Director wrote to the judge to report that defendant had been discharged from the program he entered the previous September on account of "noncompliance, thus violating the terms of his release and plea." She enclosed a letter dated March 14, 2007 from the program's Facility Director, who alleged that "[a]s a result of an extensive and thorough investigation," defendant had been tagged for thefts from vocational counselors at a school that the program used.

The Director's letter explained that 21 residents were initially under suspicion for these thefts, and that security at the school was very lax. Yet, the evidence "clearly pointed to" defendant as the thief for several reasons. First, another resident claimed to have seen defendant using keys to open doors to the vocational counselors' offices, and defendant asked this resident not to mention what he had observed. Second, defendant was involved in an unauthorized "scheme to collect money for weights in the gym," which netted $90 subsequently stolen from a locker. Third, defendant was found to possess $167, which he claimed to have saved. According to the Director, defendant "admitted that the evidence point[ed] to him," but had "not officially taken responsibility for the thefts."

On March 16, 2007, defendant appeared before the judge, who adjourned the case to "[s]ee if [the program] [would] take [defendant] back." When defendant next appeared on March 27, 2007, the prosecutor asked the judge to sentence him. Defense counsel countered that defendant had been "very successful" in treatment, and had been "clean" for 14 months. She complained that the March 14th letter was "very circumstantial," and failed to indicate that any "type of proceeding" had been held to establish her client's responsibility for the thefts. She requested that another program be found for defendant if the program he had been participating in refused to take him back.

The TASC representative stated that DTAP would have to approve any other treatment opportunity for defendant and was "not inclined" to do so. Further, a DTAP representative said that she was "clear" that DTAP was not about to offer defendant a third program. Supreme Court recessed the case so defense

counsel could speak to a DTAP supervisor, but predicted that this was "not going to work." When the case was called again later that day, the prosecutor announced that the DTAP supervisor was unwilling to afford defendant another chance in treatment.

Defense counsel requested a hearing because defendant insisted on his innocence of the thefts. Calling the Director's letter "speculation," she asserted that the program's legal department considered the charges too flimsy to investigate. She also stated that defendant's family and girlfriend had sent him money, and that he received "a stipend for being involved in a substance abuse program." Defense counsel told the judge that defendant's mother was present in the courtroom and willing to confirm that she had sent money to her son.

The following colloquy ensued:

> "THE COURT: Well, I'm not here to dispute this. In fact, you were supposed to finish your program. You didn't finish the program. You had an opportunity. You got kicked out of that program. That's it.
>
> "[DEFENSE COUNSEL]: But it's based on allegations that . . . [are] unfounded . . .
>
> "THE COURT: Let's say I agree with you that it was unfounded. They kicked him out of the program. They're not giving him another chance. What am I going to do?
>
> "[DEFENSE COUNSEL]: . . . [H]e was one week away from outpatient status.
>
> "THE COURT: This is not an illegal program. This is the D.A.'s program. The D.A. is not offering him any more programs."

When defense counsel suggested that the judge could offer defendant another program, he responded, "My program is eight years in jail. I have no alternative. I can't do it. To dismiss the case is up to the D.A."

Defense counsel reiterated her request for a hearing, to which Supreme Court responded, "Assuming I find in your favor at the hearing . . . what do I do then?" Counsel suggested that the information obtained at a hearing might persuade the DTAP supervisor to relent; if it did not, the Legal Aid Society should be allowed to seek out another program for defendant, or the judge might sentence defendant to a reduced prison term.

Supreme Court adjourned the case until April 2, 2007, so defense counsel could "speak to the people at [the program]" and "be comfortable in what they have done." The judge stated that he did not intend to hold a hearing because "[t]hese are not issues [for which] a hearing is held. If he flunks out of the program for whatever reason, he flunk[s] out of the program."

On April 2, 2007, defense counsel reported to the judge that the Director now believed that defendant had been "set up," and was willing to take him back; that the person who claimed to have seen defendant with keys had "a history," including "several reprimands"; and that theft was a common occurrence at the program. Defense counsel mentioned that defendant's mother and girlfriend were both present in court, and that she had letters documenting the funds they had sent him.

The prosecutor countered that DTAP was unwilling to give defendant another chance, and that the program was, in any event, not prepared to readmit him. The judge suggested that the DTAP supervisor might call the Director and confirm the program's stance, but the prosecutor took the position that "[r]egardless whether the program or any program is willing to take the defendant back, the D.A.'s office is not willing" because the case was "very serious."

Defense counsel continued to ask for a hearing, and Supreme Court reiterated that a hearing would not resolve anything, remarking that "[t]he program kicked him out. The People aren't willing to give him another program. And we're stuck with that situation here . . . Let's say I . . . find that he didn't violate. What am I going to do? Sue the program? Sue the D.A.'s office?" The judge did, however, adjourn the case so that he could talk to the Director. When defendant appeared in court again on April 4, 2007, Supreme Court described his conversation with the Director as follows:

> "I spoke at length with [the Director] from the program. It is clear that they firmly believe [that defendant] was responsible for the theft, and they do not want him back, so I have nothing more to do but to sentence the defendant pursuant to our agreement."

Defense counsel replied that she had also spoken to the Director, and had asked him "why the change of heart." She recounted that he was "very vague," but said "once again [that] he believes that [defendant] was set up due to the conditions of

the . . . program." She also informed the judge that the Director told defendant's girlfriend that whether to take defendant back was "not his decision." Defense counsel asked to be allowed to speak to the person who had actually decided to discharge defendant from the program, and again complained that defendant was the victim of conjecture. She suggested that the judge might consider placing defendant in a different program, or sentencing him to the minimum available prison term of five years. The prosecutor responded that she had spoken with someone from the program, who had reviewed defendant's file. This individual expressed the "firm" belief that defendant was the thief, and confirmed that he would not be readmitted.

Supreme Court next asked defendant if he wished to say anything, to which he responded, "Your Honor, there's so much, but I—no." The judge then sentenced him to eight years in prison and five years of postrelease supervision. Defendant subsequently appealed.

On December 30, 2008, the Appellate Division affirmed, concluding that Supreme Court's "inquiry regarding the circumstances concerning the defendant's discharge from a drug treatment program was sufficient to determine that [he] violated the plea agreement" (*People v Fiammegta*, 57 AD3d 1003 [2d Dept 2008]). A Judge of this Court granted defendant permission to appeal (12 NY3d 853 [2009]), and we now reverse.

Supreme Court has broad discretion when supervising a defendant subject to DTAP, and deciding whether the conditions of a DTAP plea agreement have been met (*see People v Jenkins*, 11 NY3d 282, 289 [2008]). And although DTAP is not the same as the judicial diversion program, the Legislature has endorsed judicial flexibility in CPL 216.05 (9) (b), effective October 7, 2009, which provides that "[i]n determining whether a defendant violated a condition of his or her release under the judicial diversion program [for substance abuse or dependence], the court *may* conduct a summary hearing consistent with due process and sufficient to satisfy the court that the defendant has, in fact, violated the condition" (emphasis added).

This provision is consistent with our decision in *People v Outley* (80 NY2d 702, 712 [1993]), where we adverted to the settled rule that "sentencing is a critical stage of the criminal proceeding and that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause" (internal quotation marks omitted). And in order "[t]o comply

with due process, . . . the sentencing court must assure itself that the information upon which it bases the sentence is reliable and accurate" (*id.*).

In *Outley*, we considered what process was due when a defendant "breached a no-arrest condition [of a plea bargain] by being arrested before the sentence but denies any complicity in the underlying crime" (*id.*). In each of the three cases consolidated for decision in *Outley*, the defendants maintained that "when a defendant denies the postplea criminal conduct, the court must conduct an evidentiary hearing to satisfy itself by a preponderance of the evidence that the defendant has, in fact, committed the crime for which he was arrested" (*id.*). We rejected that notion because it changed the condition of the plea from not being arrested for a crime to not actually committing a crime.

But we recognized in *Outley* that in order for a court to impose the enhanced sentence, "the mere fact of the arrest, without more, is not enough. A no-arrest condition could certainly not be held to have been breached by arrests which are malicious or merely baseless" (*id.* at 713). We therefore held that

> "[w]hen an issue is raised concerning the validity of the postplea charge or there is a denial of any involvement in the underlying crime, the court must conduct an inquiry at which the defendant has an opportunity to show that the arrest is without foundation . . . The nature and extent of the inquiry—whether through a summary hearing pursuant to CPL 400.10 or some other fair means—is within the court's discretion. The inquiry must be of sufficient depth, however, so that the court can be satisfied—not of defendant's guilt of the new criminal charge but of the existence of a legitimate basis for the arrest on that charge" (*id.* [citations omitted]).

Defendant asks us to reject *Outley* in favor of *Torres v Berbary* (340 F3d 63, 71 [2d Cir 2003]), and to hold that a defendant who faces termination from a drug treatment program on account of contested allegations of wrongdoing is entitled to a hearing akin to that afforded a defendant subject to probation or parole revocation because "due process in sentencing requires at least a showing by a preponderance of evidence to resolve disputed factual issues" (*but see Janick v Superintendent of Franklin Correctional Facility*, 253 Fed Appx 65, 66 [2d Cir 2007] [acknowledging that the United States Supreme Court

has "not shed much light on the minimum burden of proof that must be met when factual contentions are subject to dispute at sentencing"]). That is, defendant contends that he should have been provided the opportunity to testify and present evidence; to confront and cross-examine adverse witnesses, unless the court found good cause for not allowing this; to have the accusations proven by a preponderance of the evidence; and to a resolution of the relevant facts by the court.

In our view, though, the *Outley* rule is better suited for those circumstances where a defendant is expelled from a drug treatment program for misconduct. As an initial matter, DTAP is a diversion program; a defendant must successfully complete drug treatment in order to escape otherwise mandatory incarceration. This is not the same as the situation where the court changes the defendant's sentence by revoking a sentence of probation or parole at the request of the government. Moreover, it is not practical to require an evidentiary hearing every time a defendant disputes discharge from a drug treatment program for reasons unrelated to making satisfactory progress in treatment. Faced with a prison term, many—if not most—defendants will challenge their dismissal. Analogizing to *Outley*, the condition of a DTAP plea is that the defendant satisfactorily finish a drug treatment program. Accordingly, when a program discharges a defendant for misconduct, the court must carry out an inquiry of sufficient depth to satisfy itself that there was a legitimate basis for the program's decision, and must explain, on the record, the nature of its inquiry, its conclusions, and the basis for them.

Accordingly, Supreme Court was not required to conduct an evidentiary hearing in this case, or to determine by a preponderance of the evidence that defendant was guilty of the thefts of which he was accused. But the judge should have considered defendant's argument that he was kicked out of the program based on thin evidence of wrongdoing after inadequate investigation; and he should have allowed defendant to submit letters and testimony or affidavits from his mother and girlfriend about the money they claimed to have sent him.

Supreme Court understandably felt hamstrung by the District Attorney's refusal to endorse any further treatment opportunity for defendant. Nonetheless, in his supervision of this DTAP plea and as a measure of the due process owed defendant, the judge was obligated to make the requisite inquiry into the merits of defendant's discharge. Concededly, the judge's options would

have been limited in the event that he concluded that the program, in fact, did not possess a legitimate basis for expelling defendant, and the District Attorney remained unwilling to approve defendant's participation in another program. Under those circumstances, however, Supreme Court could at least offer defendant the opportunity to withdraw his plea before imposing sentence.

Accordingly, the order of the Appellate Division should be reversed, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order reversed, etc.