[2 NE3d 204, 979 NYS2d 240]

In the Matter of STATE OF NEW YORK, Respondent, v FLOYD Y., Appellant.

Argued September 12, 2013; decided November 19, 2013

**POINTS OF COUNSEL**

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Deborah P. Mantell* and *Sadie Z. Ishee* of counsel), for appellant. I. Floyd Y.'s procedural due process rights were violated by the State's introduction at trial of inadmissible and unproven accusations from non-present declarants that lacked indicia of reliability and had never been tested by cross-examination. (*Hambsch v New York City Tr. Auth.*, 63 NY2d 723; *Wagman v Bradshaw*, 292 AD2d 84; *People v Goldstein*, 6 NY3d 119; *Matter of Christina F.*, 74 NY2d 532; *Seinfeld v Robinson*, 300 AD2d 208; *Matter of State of New York v Mark S.*, 87 AD3d 73; *Wiseman v American Motors Sales Corp.*, 103 AD2d 230; *People v Mingo*, 12 NY3d 563; *Matter of State of New York v Rashid*, 68 AD3d 615, 16 NY3d 1; *Kansas v Hendricks*, 521 US 346.) II. The State's presentation of Dr. Mortiere as an expert witness violated the psychologist-patient privilege. (*Jaffee v Redmond*, 518 US 1; *Matter of Grand Jury Investigation in N.Y. County*, 98 NY2d 525; *People v Wilkins*, 65 NY2d 172; *People v Sinski*, 88 NY2d 487; *Matter of New York City Health & Hosps. Corp. v New York State Commn. of Correction*, 19 NY3d 239; *People v Christopher B.*, 102 AD3d 115; *Matter of Ashley M.*, 256 AD2d 825; *Dowling v State of New York*, 49 AD2d 982; *Ughetto v Acrish*, 130 Misc 2d 74, 130 AD2d 12; *Meyer v Supreme Lodge, Knights of Pythias*, 178 NY 63, 198 US 508.)

*Eric T. Schneiderman, Attorney General*, New York City (*Matthew W. Grieco, Barbara D. Underwood* and *Steven C. Wu* of counsel), for respondent. I. The State's expert properly relied on and testified about alleged sex offenses from official criminal

records. (*People v Sugden*, 35 NY2d 453; *People v Goldstein*, 6 NY3d 119; *People v Mingo*, 12 NY3d 563; *Matter of State of New York v Shannon S.*, 20 NY3d 99; *United States v Hall*, 419 F3d 980; *Matter of State of New York v Mark S.*, 87 AD3d 73, 17 NY3d 714; *Matter of State of New York v Pierce*, 79 AD3d 1779, 16 NY3d 712; *People v Kennedy*, 68 NY2d 569; *Burgett v Texas*, 389 US 109; *Jones v United States*, 463 US 354.) II. Mental Hygiene Law article 10 expressly abrogates the psychologist-patient privilege. (*People v Bridgeland*, 19 AD3d 1122; *Dillenbeck v Hess*, 73 NY2d 278; *Matter of New York City Health & Hosps. Corp. v New York State Commn. of Correction*, 19 NY3d 239; *Matter of Camperlengo v Blum*, 56 NY2d 251; *Matter of Melendez v Wing*, 8 NY3d 598; *Matter of State of New York v John S.*, 104 AD3d 511; *Matter of State of New York v Zimmer*, 63 AD3d 1563; *Matter of State of New York v John P.*, 20 NY3d 941.)

### OPINION OF THE COURT

RIVERA, J.

In this case, we are asked to consider whether, and to what extent, a court may admit hearsay evidence when it serves as the underlying basis for an expert's opinion in an article 10 proceeding. The circumstances of this case require a reversal and a new trial. The Due Process Clause protects against the admission of unreliable hearsay evidence, where such hearsay is more prejudicial than probative, regardless of whether it serves as the basis for an expert's properly proffered opinion testimony.

I. Facts and Procedural History

A. Floyd Y.'s Article 10 Proceeding

In January 2001, the Oswego County Court convicted Floyd Y. of four counts of sexual abuse in the first degree and four counts of endangering the welfare of a child (Penal Law §§ 130.65 [3]; 260.10 [1]). The jury found that Floyd Y. had abused his two stepchildren four times between June 1996 and February 1998. During his incarceration, Floyd Y. received therapy through a sex offender treatment program. In December 2005, prior to his release from prison, the Department of Correctional Services (DOCS) invoked Mental Hygiene Law § 9.27 and transferred Floyd Y. to Kirby Psychiatric Center without a hearing. At the time, DOCS routinely made such transfers even though it lacked statutory authority to do so (*see State of N.Y. ex rel. Harkavy v Consilvio*, 7 NY3d 607 [2006]).

During Floyd Y.'s unlawful confinement at Kirby, he was diagnosed with polysubstance abuse, pedophilia, and antisocial personality disorder. He received compulsory treatment as a sex offender, which included participation in group counseling and individual contact with treatment personnel. Dr. Catherine Mortiere, a psychologist, was one of his treating physicians.

In 2007, the legislature enacted the Sex Offender Management and Treatment Act (SOMTA) (L 2007, ch 7, § 2), which authorized the State to place any "dangerous sex offender requiring confinement" in civil management (Mental Hygiene Law §§ 10.03 [e]; 10.07 [f]). Shortly thereafter, the State invoked Mental Hygiene Law § 10.06 and ordered Floyd Y. examined by Dr. Michael Kunz, a psychiatric expert. The evaluation report filed by Dr. Kunz stated that, in his opinion, Floyd Y. "met the criteria for Pedophilia" and thus qualified for civil management under article 10. Accordingly, the State filed an article 10 civil management petition against Floyd Y.

Under article 10 of the Mental Hygiene Law, the State must establish at trial, by clear and convincing evidence, that a detained sex offender suffers from a mental abnormality as defined in that statute (see Mental Hygiene Law §§ 10.07 [d]; 10.03 [e]). Prior to his jury trial, Floyd Y. sought to exclude testimony of the State's proffered expert witnesses, Dr. Mortiere, who would testify as one of Floyd Y.'s treating physicians at Kirby, and Dr. Kunz, who would testify as the State's statutory "psychiatric examiner" under Mental Hygiene Law § 10.06 (d). The parties heavily contested the extent to which the State could present hearsay evidence through the testimony of these experts. Floyd Y. argued that the experts' opinions were inadmissible because they relied on unproven, unreliable accusations against him and that the testimony would include impermissible hearsay. The State disagreed. Supreme Court ultimately ruled against Floyd Y. and admitted both the opinion testimony and the underlying basis hearsay.

Dr. Mortiere was the State's star witness. At trial, Dr. Mortiere opined that Floyd Y. suffered from pedophilia, antisocial personality disorder, and polysubstance dependence. She further testified that the coexistence of those conditions increased the likelihood that he would reoffend. Dr. Mortiere based her opinion on victim affidavits, police reports, court records, three reports written by Dr. Kunz, a report by Floyd Y.'s expert Dr. Singer, and her own personal experience as Floyd Y.'s treating psychologist. Some of her testimony concerned the abuse for

which Floyd Y. was convicted, but she also described unproven sex offenses, which had formed the basis of her opinion. As she revealed during voir dire, a victim's accusation helped shape her opinion, but a court's acquittal made absolutely no impact. She stated, "[an acquittal] would not have made a difference one way or the other."

Although Dr. Mortiere lacked personal knowledge of the events, she nevertheless testified that Floyd Y. had committed sexual abuse against nine individuals, and she recounted the details of each alleged abuse. She described the alleged abuse of the 23-year-old victim of Floyd Y.'s 1992 sexual assault conviction; the teenage babysitter who was the victim of Floyd Y.'s 1995 harassment plea; her twin sister, who was the victim of alleged sexual abuse in 1994; the eight-year-old friend of the family who alleged an abuse in 1996 for which Floyd Y. was acquitted; the 17-year-old sister-in-law with whom Floyd Y. admittedly had inappropriate telephone conversations; the eight-year-old daughter of an ex-girlfriend whose claims of a 1998 abuse did not result in criminal charges; the 15-year-old daughter of Floyd Y.'s ex-girlfriend, who alleged abuse in 1998; and Floyd Y.'s stepchildren, who had been the victims of his 2001 conviction for sexual abuse. Dr. Mortiere opined that Floyd Y.'s continued denial of many of these incidents tended to show that he had a mental abnormality.

In addition to her rendition of these abuse allegations, Dr. Mortiere also told the jury about her therapeutic relationship with Floyd Y. Dr. Mortiere discussed Floyd Y.'s course of therapy and characterized his participation, describing his lack of progress in sex offender treatment and his belligerence toward her and other staff, particularly female staff. She disputed the statements of other doctors in Floyd Y.'s treatment history that appeared to suggest that he had been making progress because she believed him to be deceitful and driven, in part, by his desire to avoid being "locked up."

The State's other expert witness, Dr. Kunz, testified that Floyd Y. suffered from pedophilia, polysubstance abuse, and antisocial personality disorder, and met the criteria for mental abnormality. Dr. Kunz based his testimony on personal interviews with Floyd Y., clinical records, and written reports concerning Floyd Y.'s alleged sex crimes. Like Dr. Mortiere, Dr. Kunz testified about past incidents of Floyd Y.'s sexual abuse, including several uncharged instances.

In rebuttal, Floyd Y. called his own expert, Dr. Singer, who testified that Floyd Y. did not suffer from pedophilia. He opined that Floyd Y. had polysubstance dependence and personality disorder not otherwise specified with antisocial traits. Dr. Singer testified that Floyd Y.'s disorder did not "[rise] to the level of what Article 10 dictates," and placed Floyd Y.'s likelihood to reoffend on the "lower end of moderate or at the higher end of low."

The trial court gave the jury limiting instructions on its consideration of experts' testimony regarding accusations. The court told the jury to consider "any testimony as to the accusations that ended in dismissal and acquittal only for the purpose of evaluating the experts'[ ] findings and understanding the basis of their conclusions." The court further instructed the jury that testimony concerning out-of-court statements was admitted to inform the jury as to the basis of the experts' testimony and was "not to be considered as establishing the truth of those out of court statements. You are to use such testimony only for the purpose of evaluating the expert's findings." The court also instructed the jury that "[t]he opinions stated by each expert . . . were based on particular facts as the expert obtained knowledge of them and testified to them before you or as the attorney who questioned the expert asked the expert to assume."

The jury found that Floyd Y. suffered from a mental abnormality. Following a dispositional hearing, the court assigned him to the Office of Mental Health for confinement in a secure facility.

## B. Floyd Y.'s Appeal to the Appellate Division

On appeal to the Appellate Division, Floyd Y. argued that Supreme Court erred when it allowed the experts to testify to unreliable hearsay, and that Dr. Mortiere's testimony violated the psychologist-patient privilege. The Appellate Division found that Supreme Court properly admitted some, but not all, of the basis hearsay under the "professional reliability exception" and rejected the psychologist-privilege argument (*Matter of State of New York v Floyd Y.*, 102 AD3d 80, 87-88 [1st Dept 2012]). According to the Appellate Division, evidence that would otherwise be inadmissible as hearsay may nevertheless form the basis for an expert's opinion if it is the type of material "accepted in the profession as reliable in forming a professional opinion," so long as there is other evidence establishing the hearsay's reliability (*id.* at 84).

The Appellate Division first determined that Dr. Mortiere's uncontroverted testimony that witness affidavits and police reports are the type of documents "heavily relied upon in her profession" supported the trial court's decision to allow her to inform the jury that she relied on this hearsay in forming her expert opinion. The Appellate Division then examined the hearsay to determine whether it was "reliable" based on other evidence. The Court concluded that Dr. Mortiere properly relied on victim statements contained in affidavits or incorporated into police reports, and that she could inform the jury that she used those statements as the basis for her opinion. Moreover, the information relied upon by Dr. Mortiere was supported by other evidence, including police reports, plea documents, and conviction certificates, which are "deemed reliable" by the statute. (*Id.* at 85-86.)

The Appellate Division focused on four acts referenced by Dr. Mortiere that did not result in a charge or a conviction, and concluded that two uncharged accusations were reliable. The accusation from Floyd Y.'s 17-year-old former sister-in-law was reliable because Floyd Y. admitted that the events happened.[1] The accusation concerning the 15-year-old daughter of Floyd Y.'s girlfriend was reliable because, as a condition of dropping the charges against him, he signed a parole document promising to stay away from the girl.

The Appellate Division found the other two accusations unreliable and therefore "of questionable probative value." First, the 1996 accusation involving the eight-year-old friend of the family was unreliable because Floyd Y. was acquitted. Second, the 1999 accusation involving the eight-year-old daughter of an ex-girlfriend was unreliable because no charges were ever brought against Floyd Y. (*Id.* at 87-88.) The Appellate Division concluded that Supreme Court erred when it allowed these accusations into evidence, but the error was harmless because the evidence was a small fraction of the case against Floyd Y. and Supreme Court gave proper limiting instructions (*id.* at 88). The Appellate Division also concluded that Mental Hygiene Law § 10.08 (c) abridged the psychologist-patient privilege (*id.*).

## II. Floyd Y.'s Constitutional Challenge

Floyd Y. appeals to this Court as of right under CPLR 5601

---

1. Floyd Y. does not challenge the evidence concerning this alleged victim in the present appeal.

(b) (1), alleging that the trial procedures violated his constitutional right to due process. He asserts that the admission of experts' basis information violated state and federal constitutional due process as well as New York's prohibition on the use of unreliable hearsay. He further claims that the admission of Dr. Mortiere's testimony violated the statutory psychologist-patient privilege.

Floyd Y. argues that Supreme Court violated his right to due process by allowing experts to introduce unreliable, testimonial hearsay without giving him the opportunity to cross-examine the out-of-court declarants. Floyd Y. likens his article 10 trial to a criminal proceeding and argues that he should have had the same confrontation rights enjoyed by criminal defendants (cf. *Pointer v Texas*, 380 US 400 [1965]; *Crawford v Washington*, 541 US 36 [2004]; *Davis v Washington*, 547 US 813 [2006]). Alternatively, he argues that due process required all evidence at his trial to meet a minimum standard of reliability. Floyd Y.'s arguments in support of a right to confrontation in article 10 proceedings are compelling but nonetheless unsupportable under the United States Supreme Court's and this Court's respective jurisprudence on civil confinement proceedings. However, his argument that due process requires a minimum standard of reliability is correct.

A. Civil Confinement Proceedings

When a sex offender commitment statute is punitive in nature, the respondent enjoys the same due process rights as a criminal defendant (*Specht v Patterson*, 386 US 605, 609-610 [1967]). However, when the state acts through its parens patriae power to confine a sex offender for therapy and treatment, commitment proceedings are civil, not criminal, in nature (*Allen v Illinois*, 478 US 364, 374 [1986]; *Addington v Texas*, 441 US 418, 425 [1979]). A state may only use civil process to confine a sex offender for treatment of "a 'mental abnormality' . . . that makes it difficult, if not impossible, for the person to control his [or her] dangerous behavior" (*Kansas v Hendricks*, 521 US 346, 358 [1997]; *Kansas v Crane*, 534 US 407, 412-414 [2002]). The constitutional protections of the Fifth and Sixth Amendments do not apply in such proceedings (*Allen*, 478 US at 374). Rather, the Due Process Clauses of the Fifth and Fourteenth Amendments, as expressed by the *Mathews v Eldridge* (424 US 319, 335 [1976]) balancing test, govern the scope of procedural due process (*Addington*, 441 US at 425).

■ New York's SOMTA defines a "dangerous sex offender requiring confinement" as "a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law § 10.03 [e]). Furthermore, SOMTA purports to provide treatment to confined sex offenders (Mental Hygiene Law § 10.10). As the legislature found, "some sex offenders . . . may require long-term specialized treatment modalities to address their risk to reoffend," and the State "should offer meaningful forms of treatment . . . in all criminal and civil phases" (Mental Hygiene Law § 10.01 [b], [f]). The law requires the State to "develop and implement a treatment plan in accordance with [Mental Hygiene Law § 29.13]" (Mental Hygiene Law § 10.10 [b]). By definition, then, SOMTA falls squarely within the substantive due process requirements for civil process as stated by *Hendricks* and *Crane*. Moreover, New York courts have recognized that SOMTA is not a penal statute, but rather one with a remedial purpose (*e.g. People v Harnett*, 16 NY3d 200, 206 [2011]; *Matter of State of New York v Enrique T.*, 93 AD3d 158, 169-170 [1st Dept 2012]; *Matter of State of New York v Nelson*, 89 AD3d 441, 441-442 [1st Dept 2011]; *Matter of State of New York v Daniel OO.*, 88 AD3d 212, 219-220 [3d Dept 2011]; *Matter of State of New York v Campany*, 77 AD3d 92, 98 [4th Dept 2010]; *Matter of State of New York v Farnsworth*, 75 AD3d 14, 20-24 [4th Dept 2010]). Thus, based on controlling precedent, article 10 trials are civil proceedings, which must be governed by the *Mathews* test.[2]

---

**2.** In concurrence, Judge Smith contends that "[t]he primary purpose of article 10 is to prevent sex offenders from committing more sex crimes" and that it thus amounts to a criminal sanction (concurring op at 119). While it is true that article 10 seeks to reduce recidivism through confinement, it also provides "treatment modalities" to address the underlying mental abnormality that makes a sex offender likely to reoffend (*see* Mental Hygiene Law § 10.01 [b]). If the confinement and management required by article 10 did not provide therapy to treat a sex offender's mental abnormality, then the statute could not survive constitutional scrutiny. It would, instead, be a "shadow criminal law" requiring criminal procedural protections (*cf. Allen v Illinois*, 478 US 364, 384 [1986, Stevens, J., dissenting]). Without evidence that civil management, whether during confinement or as part of a strict and intensive supervision and treatment outpatient regime, provides some sort of sham treatment, we must conclude that article 10 trials are civil proceedings, analyzed under the Due Process Clause, not the Fifth and Sixth Amendments.

B. *Mathews v Eldridge* Flexible Due Process

The *Mathews* test "is a flexible concept" that weighs three factors: (1) the private interest of the litigant; (2) the risk of erroneous deprivation in the absence of substitute procedures; and (3) the State's interest in avoiding additional procedures (*People v David W.*, 95 NY2d 130, 136-137 [2000]). The test ensures that procedures serve the aims of the proceeding without arbitrarily depriving litigants of their rights.

Here, it is indisputable that Floyd Y.'s interest is significant. The Federal and State Constitutions protect individual liberty, and it is one of our most cherished and protected rights. The potential for indefinite confinement threatens a liberty interest of the highest order (*Hendricks*, 521 US at 356; *Vitek v Jones*, 445 US 480, 494-495 [1980]; *Humphrey v Cady*, 405 US 504, 509 [1972]). Thus, this factor weighs in favor of Floyd Y.

The second factor, which considers the risk of erroneous deprivation in the absence of substitute procedures, also weighs in favor of Floyd Y. Article 10 provides the State with access to a broad range of information about a sex offender and provides for expert assessments by a psychiatric examiner. This extends from the point when the State determines whether to proceed with a civil management proceeding, through the proceeding itself, and continues during the period of civil management (Mental Hygiene Law §§ 10.06 [d]; 10.08 [a], [b], [c], [g]; 10.09 [b], [c], [d], [f]; 10.11 [a] [1], [2]). The risk that this information could be misused, or introduced at trial even when it is unreliable, calls for substantial procedural protection.

It is true that article 10 provides for a host of procedural protections. The respondent has a right to counsel (Mental Hygiene Law § 10.08 [g]; *People ex rel. Rogers v Stanley*, 17 NY2d 256, 259 [1966]; *Rivers v Katz*, 67 NY2d 485, 497 [1986]), and a jury trial (Mental Hygiene Law § 10.07 [a]; *Matter of State of New York v Myron P.*, 20 NY3d 206, 213 [2012]),[3] conducted under the rules of evidence (Mental Hygiene Law § 10.07 [c]). Moreover, the State has the burden to establish by clear and convincing evidence that the respondent meets the statutory definition of a dangerous sex offender requiring confinement (Mental Hygiene Law § 10.07 [d]).

However, article 10 does not explicitly limit the hearsay testimony of experts even though it essentially envisions a

---

**3.** Under Mental Hygiene Law § 10.07 (b), the respondent may waive the right to a jury trial, in which case the court shall conduct the trial.

"battle of the experts" to determine whether the respondent has a mental abnormality (*Matter of State of New York v Andrew O.*, 16 NY3d 841, 844 [2011]). In many article 10 trials, expert testimony may be the only thing a jury hears (Hon. Colleen D. Duffy, *The Admissibility of Expert Opinion and the Bases of Expert Opinion in Sex Offender Civil Management Trials in New York*, 75 Alb L Rev 763, 765-767 [2012]). Experts enter "upon the jury's province, since the expert—and not the jury— draws conclusions from the facts" (*People v Cronin*, 60 NY2d 430, 432 [1983]), and there is a correspondingly high risk that jurors will rely on unreliable material only because it was introduced by an expert. Moreover, article 10 trials inevitably involve devastating accusations. At a minimum, each and every article 10 respondent has been convicted of a sex crime. In cases like Floyd Y.'s, the facts can involve horrible offenses against children. Juries may be predisposed to doubt the convicted sex offender and believe the State's expert. Thus, there is measurable value to a requirement that experts only introduce evidence that bears independent indicia of reliability and sufficient probative value. Therefore, this factor weighs in favor of Floyd Y.

With respect to the third factor in the *Mathews* analysis, the State's interest is significant, but it is outweighed by the other two factors. Article 10 already requires a civil trial with expert witnesses and counsel. Requiring the State to show that hearsay basis information is both helpful to the jury and meets a certain threshold of reliability is not unduly burdensome.

Floyd Y.'s liberty interests were squarely at issue in his article 10 proceeding because an adverse determination can lead to indefinite detention. As a consequence, we must be cognizant of Floyd Y.'s due process rights and ensure that those rights are preserved (*see Crane*, 534 US at 413; *Hendricks*, 521 US at 368-369; *Allen*, 478 US at 377; *Jones*, 445 US at 494-495; *Addington*, 441 US at 425; *Humphrey*, 405 US at 510; *Rogers*, 17 NY2d at 259; *Rivers*, 67 NY2d at 497; *David W.*, 95 NY2d at 136). A requirement that evidence meet a test of reliability and substantial relevance is necessary to protect the important liberty interests at stake in article 10 proceedings.

In the civil context, reliability can be assured in many ways. The Due Process Clause has no inflexible standard for judging reliability, and substitutes for live confrontation are acceptable even in proceedings that implicate liberty (*Morrissey v Brewer*, 408 US 471, 489 [1972]; *Gagnon v Scarpelli*, 411 US 778, 782 n 5 [1973]; *Wolff v McDonnell*, 418 US 539, 567 [1974]; *People v*

*Fiammegta*, 14 NY3d 90, 98 [2010]). Still, courts admit hearsay evidence only when it falls within a recognized exception to the hearsay rule and the proponent can demonstrate that it is reliable (*Nucci v Proper*, 95 NY2d 597, 602 [2001]; *People v Brensic*, 70 NY2d 9, 14 [1987]; *People v Nieves*, 67 NY2d 125, 131 [1986]; *see also* Barker & Alexander, Evidence in New York State and Federal Courts § 8:1 [2d ed 2011]).

Although we have held that hearsay may play a role in an expert's testimony because the expert may base an opinion on hearsay if it "is of a kind accepted in the profession as reliable in forming a professional opinion" (*People v Goldstein*, 6 NY3d 119, 124 [2005]), we have not decided whether, or under what circumstances, an expert's underlying basis information may be admissible in a civil proceeding, even though it consists of hearsay statements otherwise subject to exclusion (*id.*; *Hinlicky v Dreyfuss*, 6 NY3d 636, 648 [2006]). In *Goldstein*, we specifically warned that allowing admission of such hearsay statements simply because an expert testifies to those statements as the basis for the expert's opinion "might effectively nullify the hearsay rule by making [an] expert [into] a conduit for hearsay" (6 NY3d at 126 [internal quotation marks omitted]). Our concurring colleagues would exclude all basis hearsay from trial. Yet, in many cases, including article 10 trials, the admission of the hearsay basis is crucial for juries to understand and evaluate an expert's opinion. An inflexible rule excluding all basis hearsay would undermine the truth-seeking function of an article 10 jury by keeping hidden the foundation for an expert's opinion.

Contrary to our concurring colleagues' contention, basis hearsay does not come into evidence for its truth, but rather to assist the factfinder with its essential article 10 task of evaluating the experts' opinions. In order to assess an expert's testimony, the factfinder must understand the expert's methodology and the practice in the expert's field. In this case, for example, Dr. Mortiere testified that experts in her field "rely heavily upon witness statements, affidavits, [and] victim statements . . . because in treatment there are issues of confronting a sexual offender with exactly what happened." Understanding her diagnosis and her treatment of Floyd Y. requires understanding the information she considered when making her diagnostic and treatment decisions. As our concurring colleagues concede, out-of-court statements are routinely admitted at trial for purposes other than to demonstrate their truth (concurring op

at 115). Factfinders in article 10 trials cannot comprehend or evaluate the testimony of an expert without knowing how and on what basis the expert formed an opinion.

To the extent that a factfinder's assessment might turn on its acceptance of basis evidence as true, article 10 provides the respondent with an opportunity to challenge the State's expert by presenting a competing view of the basis evidence through the testimony of the respondent's expert.[4] Moreover, the court can instruct the jury about the proper consideration due the basis evidence, as the court did in this case. Here, the court instructed the jury only to consider the out-of-court statements "for the purpose of evaluating the experts'[ ] findings and understanding the basis of their conclusions." The court also instructed the jury that it could reject an expert's opinion "if after careful consideration of all the evidence in the case, expert and other, you disagree with the opinion." These instructions adequately informed the jury of its role as factfinder and the limited purpose of out-of-court statements introduced to help evaluate an expert's opinion.

The different approaches adopted by other jurisdictions illustrate the difficulty in setting the right balance between admitting and excluding hearsay basis evidence (see generally Duffy, 75 Alb L Rev at 792-797). On one end of the spectrum, Virginia, Kansas, and Massachusetts prohibit experts from introducing any inadmissible hearsay at sex offender proceedings. (Lawrence v Commonwealth, 279 Va 490, 494-497, 689 SE2d 748, 750-751 [2010]; In re Care and Treatment of Colt, 289 Kan 234, 243, 211 P3d 797, 804 [2009]; Commonwealth v Markvart, 437 Mass 331, 338, 771 NE2d 778, 783-784 [2002].) On the other end, South Carolina allows the expert to introduce all basis evidence without regard to independent bases of admissibility (In re Manigo, 389 SC 96, 106, 697 SE2d 629, 634 [2010]). A significant number of jurisdictions take a flexible approach that allows the admission of hearsay but requires courts

---

4. The concurrence believes that the respondent's expert testimony is useless in offsetting the hearsay's impact on the jury because the expert cannot opine as to the veracity of the basis evidence. Of course it is also the case that the State's expert cannot assert the truth of the basis evidence, and from the respondent's perspective, this is but one of the weaknesses of the State's case that can be mined during the article 10 proceeding. Through the respondent's own expert the jury hears why the State's expert testimony is unconvincing, including why it is not credible. Moreover, cross-examination of the State's expert provides additional opportunity to challenge the opinion and emphasize its weaknesses, including the expert's reliance on this type of basis evidence.

to make an independent reliability assessment (*see e.g. In re Detention of Stenzel*, 827 NW2d 690, 710 [Iowa 2013]; *In re Interest of A.M., Jr.*, 281 Neb 482, 514-515, 797 NW2d 233, 261-262 [2011]; *In re Civil Commitment of Williams*, 735 NW2d 727, 731-732 [Ct App Minn 2007]; *State Bd. of Registration for Healing Arts v McDonagh*, 123 SW3d 146, 156 [Mo 2003]). In our view, such a requirement protects the substantial liberty interests of respondents in those states.

█ Due process requires any hearsay basis evidence to meet minimum requirements of reliability and relevance before it can be admitted at an article 10 proceeding. In article 10 trials, hearsay basis evidence is admissible if it satisfies two criteria. First, the proponent must demonstrate through evidence that the hearsay is reliable. Second, the court must determine that the "probative value in helping the jury evaluate the [expert's] opinion substantially outweighs [its] prejudicial effect" (*cf.* Fed Rules Evid rule 703). These reliability and substantial relevance requirements provide a necessary counterweight to the deference juries may accord hearsay evidence simply because an expert has propounded it. The requirements prevent an expert from serving as a passive conduit for hearsay, yet allow the jury to evaluate expert opinions by considering reliable and probative evidence. This rule gives the judge an active role in managing the article 10 proceeding and preserving its integrity.

III. The Hearsay Basis Evidence

█ Applying this two-step analysis to the facts of this case, we conclude that the trial court improperly permitted the State's experts to introduce certain unreliable hearsay, as well as some hearsay with a patina of reliability that nevertheless was more prejudicial than probative as a matter of law. These errors denied Floyd Y. due process.

The State submitted hearsay through Drs. Mortiere and Kunz regarding nine alleged sexual abuse victims. Admission of hearsay about sexual abuse supported by adjudications of guilt did not violate due process. Specifically, Floyd Y. was convicted of or pleaded guilty to crimes arising out of his treatment of four of the alleged victims: a 23-year-old woman (sexual abuse in the second degree); a teenage babysitter (harassment); and his two stepchildren (sexual abuse in the first degree). The evidence of reliability in those cases was a criminal justice adjudication unfavorable to Floyd Y.

Floyd Y.'s admissions also provided the independent basis for the reliability of some of the hearsay. Floyd Y. admitted that he

had inappropriate phone conversations with his 17-year-old sister-in-law. Provided that a court found the 17-year-old girl's victim affidavit substantially more probative than prejudicial, the hearsay should have been admitted.

Conversely, unlike adjudications and admissions of guilt, an acquittal cannot provide the basis for reliability. Charges that resulted in acquittal are surely more prejudicial than probative on the question of the respondent's mental abnormality. Therefore, in the case of the eight-year-old friend of the family, Floyd Y.'s acquittal of criminal charges bars admission of those accusations, absent some other basis to substantiate them. Similarly, uncharged accusations should have been excluded. Here, police were unable to substantiate the accusations of the eight-year-old daughter of Floyd Y.'s ex-girlfriend, and this hearsay should have been excluded. The uncharged allegations made by the teenage babysitter's twin sister were not supported by extrinsic evidence or Floyd Y.'s own admissions, and should not have been admitted as hearsay.

Criminal charges that resulted in neither acquittal nor conviction require close scrutiny. Police charged Floyd Y. in connection with the accusation of the 15-year-old daughter of his ex-wife, but those charges were dropped in connection with Floyd Y.'s parole agreement promising to stay away from the girl. The parole agreement provides sufficient reliability to weigh in favor of admission of this hearsay. However, unlike an adjudication of guilt, the parole agreement does not conclusively prove the allegations. Supreme Court should have taken care to ensure that they were substantially more probative than prejudicial. In such a case, the better course would have been to require live confrontation of the declarant to ensure the statement's reliability.

The admission of the unreliable hearsay was not harmless error. The State alleged that Floyd Y. was a pedophile and presented evidence that he had abused four prepubescent children. However, two of those allegations were based on hearsay that violated Floyd Y.'s due process rights. There is a reasonable possibility the jury could have reached another verdict had it not heard testimony that Floyd Y. had committed those two sex offenses (*People v Crimmins*, 36 NY2d 230, 237 [1975]).

Therefore, the order of the Appellate Division should be reversed and a new trial ordered.[5]

SMITH, J. (concurring).

## I

The majority reverses the Appellate Division's order on the ground that the "Due Process Clause protects against the admission of unreliable hearsay evidence" (majority op at 98). But hearsay, reliable or not, is generally inadmissible under New York law, and the hearsay in this case falls within no exception to the rule. I would therefore reverse on hearsay grounds, and would not reach the constitutional question.

## A

At a jury trial to determine whether Floyd Y., a detained sex offender, suffered from a "mental abnormality" as defined in article 10 of the Mental Hygiene Law, the State's expert witnesses opined that he did suffer from such an abnormality, and as support for their opinions were permitted to relate to the jury accusations by several alleged victims of Floyd's sex crimes. The victims did not testify. The admission of the experts' testimony to what the victims said raises two questions: Were the victims' statements hearsay? And if so, was the testimony nevertheless admissible under the so-called "professional reliability" exception to the hearsay rule?

We answered the first question yes in *People v Goldstein* (6 NY3d 119 [2005]). That was a criminal case in which the People called an expert, Dr. Hegarty, to give her opinion that the defendant was sane at the time of the crime. Hegarty had interviewed a number of people who had encountered the defendant, and was allowed to tell the jury what those people told her about their experiences and observations. We held that the interviewees' statements to Hegarty were "testimonial" hearsay, and that their admission violated the Confrontation Clause (6 NY3d at 127-129). We rejected the People's argument that the statements "were not offered to prove the truth of what the interviewees said" but "only to help the jury in evaluating Hegarty's opinion" (*id.* at 127); we pointed out that the interviewees' statements would have been of no use to the

---

**5.** In light of our disposition of this appeal, we need not reach and express no opinion as to whether article 10 abrogates the psychologist-patient privilege.

People unless the jury accepted them as true. On the question of whether the statements of Floyd Y.'s alleged victims were hearsay, *Goldstein* controls this case.

## B

In *Goldstein*, we also discussed, but did not decide, another hearsay issue: Do statements like those recounted by Hegarty in *Goldstein* (or by the State's experts in this case) fall within an exception to the hearsay rule? The arguably applicable exception is that an expert is permitted to rely on hearsay in forming his or her opinion, so long as the material relied on "is of a kind accepted in the profession as reliable" (*People v Sugden*, 35 NY2d 453, 460 [1974]). The unanswered question is whether this exception permits the proponent of the expert's testimony to elicit not only the opinion, but also the hearsay statements on which it is based.

This question was not argued by the parties in *Goldstein*, and *Goldstein* was decided on Confrontation Clause, not hearsay, grounds. As we observed, both parties in *Goldstein* seemed to assume that, as a matter of New York law, if her opinion was properly admitted "Hegarty was free, subject to defendant's constitutional right of confrontation, . . . to repeat to the jury all the hearsay information on which it was based" (6 NY3d at 126). That was, we said, "a questionable assumption" (*id.*). We added:

> "[I]t can be argued that there should be at least some limit on the right of the proponent of an expert's opinion to put before the factfinder all the information, not otherwise admissible, on which the opinion is based. Otherwise, a party might effectively nullify the hearsay rule by making that party's expert a 'conduit for hearsay' " (*id.*, quoting *Hutchinson v Groskin*, 927 F2d 722, 725 [2d Cir 1991]).

This case, unlike *Goldstein*, squarely presents the question of whether, and if so when, the proponent of an expert's testimony may put "basis" hearsay before the jury.

## C

As a matter of principle, I see no reason why basis hearsay should be allowed. In general, exceptions to the prohibition on hearsay have been recognized only when the hearsay fits within

a class of statements (e.g., excited utterances, business records, dying declarations) in which the risk of error or wilful misrepresentation—and hence the need for cross-examination of the declarant—is relatively small. But there is nothing about basis hearsay that makes it inherently trustworthy. And the authorities confirm the conclusion that this reasoning suggests. Basis hearsay, when offered by the proponent of the expert's testimony, is generally considered inadmissible.

While our Court has apparently never decided this issue, the Appellate Division did in *Wagman v Bradshaw* (292 AD2d 84, 85-86 [2d Dept 2002]):

"[W]hile the expert witness's testimony of reliance upon out-of-court material to form an opinion may be received in evidence, provided there is proof of reliability, testimony as to the express contents of the out-of-court material is inadmissible."

In their New York Evidence Handbook, Professors Martin, Capra and Rossi agree with *Wagman*. They say:

"Where the expert relies on information not in evidence, it is the expert's opinion, not the underlying information, that is disclosed to the jury. The [rule permitting experts to rely on hearsay evidence] does not permit the proponent to bypass the hearsay rule by having an expert rely on hearsay only to disclose that hearsay to the jury in the guise of providing a foundation for the expert's opinion" (Martin, Capra & Rossi, New York Evidence Handbook § 7.3.4 at 625 [2d ed 2003] [footnote omitted]).

Under New York law as stated in *Wagman* and the Evidence Handbook, the hearsay in this case was improperly admitted, and Floyd Y. is entitled to a new trial.

## D

The rule in the federal courts appears to be more flexible—i.e., more tolerant of the admission of hearsay underlying expert opinions. Since the issue is open in our Court, we are free if we like to adopt the federal approach as a matter of state law. If we were to do so, however, the result in this case would be the same: the hearsay should not have been admitted.

Under rule 703 of the Federal Rules of Evidence:

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or

personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

Rule 703 thus creates a balancing test—albeit one weighted against the admission of basis hearsay. The hearsay must be excluded unless its probative value "substantially outweighs" its prejudicial effect. As the committee that drafted this language explained, it "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert" (2000 Advisory Comm Notes, Fed Rules Evid rule 703).

In this case, the courts below, though they did not cite rule 703, may have intended to apply a similar balancing test, for they permitted the experts to relate hearsay information after ruling that the information was "reliable." But if the lower courts were following a rule 703 approach, they erred by equating "probative value" with reliability and "prejudicial effect" with unreliability.

The basic point of the hearsay rule is that a party to litigation is entitled to test by cross-examination a statement that is presented to the jury as true, and that it is for the jury to decide, having listened to the cross-examination, whether the statement is reliable. To say that hearsay is admissible—i.e., that cross-examination is unnecessary—because a court thinks the statement is reliable is to usurp the functions of the cross-examiner and the factfinder, and to defeat the point of the rule. In other words, the hearsay rule permits a party to test, by cross-examination, whether an apparently reliable statement is as good as it looks. As the United States Supreme Court put it in *Crawford v Washington* (541 US 36, 61 [2004]), addressing the different, but related, question of when the Confrontation Clause applies: "The Clause . . . reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." The hearsay rule reflects a similar judgment—

that reliability should ordinarily be determined through cross-examination.

Thus, it is a mistake to suggest that, because a hearsay statement seems to be reliable, its "probative value" outweighs its "prejudicial effect." The policy underlying the rule is that, in general, hearsay is without probative value as to the truth of the matter stated by the out-of-court declarant. And the more likely the jury is to accept the statement for its truth—i.e., the more reliable the statement appears to be—the greater the prejudice.

Rule 703 should therefore be interpreted to require not an assessment of the reliability of an out-of-court statement, but the sort of balancing frequently performed in other contexts—a determination of whether the utility of an out-of-court statement for a legitimate, nonhearsay purpose outweighs the danger that the jury will accept the statement for its truth. For example, in our recent decision in *People v Morris* (21 NY3d 588 [2013]), an out-of-court statement—the tape of a 911 call—was admitted for the purpose of explaining to the jury why the police took the action they did; the jury was instructed that it could not consider the statements made in the 911 call for their truth. The Judges of this Court disagreed about whether the value of the statement for a nonhearsay purpose outweighed its prejudicial effect (*see* 21 NY3d at 597, 602, 604). No one suggested, however, that the statement was more probative than prejudicial simply because it was "reliable"—i.e., likely to be true. Federal courts have interpreted rule 703 to require a similar balancing of hearsay against nonhearsay purposes (*Turner v Burlington N. Santa Fe R.R. Co.*, 338 F3d 1058, 1061-1062 [9th Cir 2003]; *McDevitt v Guenther*, 522 F Supp 2d 1272, 1294 [D Haw 2007]).

If rule 703 governed this case, the admissibility of the out-of-court statements by Floyd Y.'s alleged victims would depend on whether their probative (nonhearsay) value—helping the jury evaluate the testimony of the State's experts—"substantially outweighs" their prejudicial (hearsay) effect—the risk that the jury would take the statements as true. But in this case, as in *Goldstein* (6 NY3d at 127), the jury could not have used the hearsay statements to evaluate the expert's testimony without first deciding whether those statements were true or false; the hearsay accusations of sexual misconduct by Floyd Y. could bolster the experts' opinions only if the jury believed them to be true. The probative value of the statements thus is inseparable

from, and cannot outweigh, their prejudicial effect, and the statements should not have been admitted. This will often be the result in cases to which rule 703 applies, but there will be exceptions: the content of the statements may be cumulative of other, admissible, evidence, or may be unimportant in itself. In such a case, the statements' prejudicial effect will be slight, and they may be admitted as probative of the expert's methodology—to show, perhaps, that the expert left no stone unturned.

The statements at issue in this case were inadmissible hearsay under New York law, whether our Court follows the rule stated in *Wagman* or the less restrictive federal rule.

## E

The majority opinion in this case says little about the hearsay rule and the professional reliability exception as they are generally applied in civil and criminal trials. It discusses neither the New York authorities I have cited nor Federal Rule 703. Rather, it seems to create a special rule for cases brought against detained sex offenders under article 10 of the Mental Hygiene Law, endorsing a "flexible approach that allows the admission of hearsay but requires courts to make an independent reliability assessment" (majority op at 108). Why the hearsay rule should be more flexible in article 10 cases—why a jury in such a case should be presented with basis hearsay that would be inadmissible if an expert were testifying in an ordinary civil suit based on an automobile accident—is not explained. If anything, the quasi-criminal nature of article 10 proceedings, which I discuss in section II below, would call for a strict, not a flexible, approach.

The majority says that "in many cases, including article 10 trials, the admission of the hearsay basis is crucial for juries to understand and evaluate an expert's opinion" (majority op at 107). This misses a basic point. Reliance on inadmissible evidence is a weakness, not a strength, in an expert's opinion; an opinion that a jury cannot "understand and evaluate" without hearing inadmissible evidence is a worthless opinion.

The professional reliability exception to the hearsay rule says that an expert's reliance on inadmissible evidence does not make the opinion inadmissible; but such reliance does open the opinion to attack. The *opponent* of the party presenting the expert may, if he chooses, try to discredit the witness by showing that her opinion depends on facts that have not been, and cannot be, proved in the courtroom. But to allow the *proponent*

of the expert to say to the jury, in effect: "You should believe my expert because some people told her a lot of things I can't prove, and here's what they told her" is utterly inconsistent with the hearsay rule.

The point is illustrated by one of the leading New York cases on the professional reliability exception, *People v Stone* (35 NY2d 69 [1974]). *Stone* held that a witness who relied in part on inadmissible evidence was not barred from giving an opinion where "an independent, legally competent basis" for the opinion existed (35 NY2d at 73). It was critical to the opinion's admissibility that it was "substantially, though not exclusively, based upon observation and examination of the defendant and facts in evidence" (*id.* at 76). We made clear that the expert's reliance on inadmissible evidence could be a basis for "challenges to [the opinion's] weight on cross-examination," and noted that the trial court had instructed the jury that it could accept the expert's testimony if it was "based on underlying facts which have been established" (*id.* at 74).

The majority says that "basis hearsay does not come into evidence for its truth" (majority op at 107), but never explains how the victims' statements in this case could possibly bolster the State's experts' opinions if the jury did not accept the statements as true. Nor is it clear why, if the hearsay in this case was not admitted for its truth, the majority is so concerned with whether it is reliable. The majority adds that even if the jury "might" accept basis evidence as true, that is not a problem because the respondent in an article 10 case may present "a competing view" by calling his own expert (majority op at 108). But the doctors who testify at article 10 trials are not experts in veracity. They cannot tell a jury whether an alleged victim's statement is true or false—and if they could, the hearsay rule does not permit the substitution of an expert's opinion for cross-examination.

The concern underlying the majority's hearsay analysis seems to be that excluding basis hearsay will "undermine" the jury's "truth-seeking function . . . by keeping hidden" important information (majority op at 107). The hearsay rule does sometimes do that, but we have rejected the idea of recognizing an "amorphous" reliability exception to it (*People v Nieves*, 67 NY2d 125, 131 [1986]). There is, as I have said, no reason to be more tolerant of hearsay in article 10 cases than in others. Indeed, there is the less reason to be tolerant in this case, because nothing in the record shows that the victims' accounts

of Floyd Y.'s crimes could not have come into evidence in the orthodox way: Why could not the State call the victims as witnesses, and let Floyd Y.'s lawyer cross-examine them? I understand that no one wants to subject the victims to inconvenience or unpleasantness. But that is what usually happens when the State wants to incarcerate someone.

## II

Since the majority decides this case on due process grounds, I will also express my view on the constitutional issue. I agree with the majority's result, but not its reasoning. I would hold that a respondent in a proceeding under article 10 of the Mental Hygiene Law is constitutionally entitled to the same right of confrontation as a defendant in a criminal case.

The majority's analysis proceeds on the premise that article 10 proceedings are civil, not criminal, and applies the balancing test of *Mathews v Eldridge* (424 US 319 [1976]) to decide that Floyd Y.'s due process rights have been violated. We have indeed described article 10 as a "remedial" rather than a "penal" statute (*People v Harnett*, 16 NY3d 200, 206 [2011]), and the United States Supreme Court has held that a proceeding brought to confine a "sexually dangerous person" for "care and treatment" is a civil, not a criminal, proceeding for purposes of the federal constitutional privilege against self-incrimination (*Allen v Illinois*, 478 US 364, 365, 369 [1986]). But the "civil" label cannot be the end of the inquiry.

Proceedings under article 10 may be civil, but they bear a significant resemblance to criminal cases. Most obviously, they are brought only against people who have committed crimes (or have committed acts that, but for the offender's mental condition, would be criminal) (Mental Hygiene Law § 10.03 [g]); and they can and usually do result in the confinement of the respondent to a "secure" facility (Mental Hygiene Law § 10.03 [e]; *see* NY St Off of Mental Health, 2012 Ann Rep on the Implementation of Mental Hygiene Law Article 10 at 4 [Apr. 2013] [OMH Report] [241 out of 340 cases resulted in a finding that confinement was required]). Indeed, a respondent in an article 10 proceeding faces a threat to his liberty more severe than that faced by most criminal defendants: He may be confined until a court finds that he "no longer is a dangerous sex offender requiring confinement" (Mental Hygiene Law § 10.09 [e])—which could be for the rest of his life. According to the Office of Mental Health, of 288 people who entered treatment in secure

facilities during the first five years of article 10's existence, only one has completed treatment and been discharged (OMH Report at 11). A law review article says: "[H]istory has shown that once a person is committed as a sexually violent predator, it's unlikely that he will ever be released" (Lave, *Throwing Away The Key: Has the Adam Walsh Act Lowered the Threshold For Sexually Violent Predator Commitments Too Far?*, 14 U Pa J Const L 391, 420 [Dec. 2011]).

Proceedings under article 10 of the Mental Hygiene Law are much more similar to criminal prosecutions than are proceedings under article 9, the statute generally providing for civil commitment of mentally ill people who present a danger to themselves or others. The dominant purpose of article 10, unlike that of article 9, is the protection of the community from criminal conduct. I grant that protecting the community is an important purpose of article 9 also; but in many article 9 cases the protection of the mentally ill person himself or herself is at least equally important. Article 9 proceedings are the sort of case that the Supreme Court distinguished from criminal cases in *Addington v Texas* (441 US 418, 429 [1979]) by saying:

> "[I]t is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty. One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma. . . . It cannot be said . . . that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed" (citations omitted).

This language from *Addington* cannot be applied to article 10 cases. No one will say with a straight face that article 10 proceedings are brought, to a significant degree, for the benefit of the sex offender, or that a sex offender who is spared from article 10 confinement has missed an opportunity to improve his life. The primary purpose of article 10 is to prevent sex offenders from committing more sex crimes.

Because of the quasi-criminal quality of article 10 proceedings, I find it unacceptable to subject the confrontation rights of respondents in such proceedings to the balancing test of *Mathews v Eldridge*. The *Mathews* test was originally designed, as the Supreme Court pointed out in *Allen v Illinois*, as a way of deciding the procedural safeguards required "before a person

might be deprived of property" (*Allen*, 478 US at 374; *cf. Hamdi v Rumsfeld*, 542 US 507, 575-576 [2004, Scalia, J., dissenting] [criticizing use of the *Mathews* test to justify a person's detention]). It is true that the Court in *Allen* relied on *Mathews* in rejecting the application of the privilege against self-incrimination in proceedings for the confinement of sex offenders; but in doing so it emphasized that "[t]he privilege against self-incrimination . . . is not designed to enhance the reliability of the factfinding determination" (*id.* at 375). The same cannot be said of the right of confrontation, and I would hold that a sex offender who is subject to confinement under article 10 is entitled, as a matter of due process under the Federal and State Constitutions, to no less a right of confrontation than any criminal defendant.

It is beyond dispute that Floyd Y. was not given in this case the kind of confrontation right that is required in criminal cases. His situation is indistinguishable from that of the defendant in *Goldstein*, for whom we ordered a new trial because his right of confrontation had been infringed. For that reason I would, if I were to reach the question, agree with the majority that the order of the Appellate Division must be reversed on constitutional grounds.

Judges GRAFFEO, READ, PIGOTT and ABDUS-SALAAM concur with Judge RIVERA; Judge SMITH concurs in result in an opinion in which Chief Judge LIPPMAN concurs.

Order reversed, without costs, and a new trial ordered.