OPINION OF THE COURT
Daniel P. Conviser, J.
The respondent is the subject of a petition for sex offender civil management pursuant to article 10 of the Mental Hygiene Law. He moves here to preclude the State’s expert from reviewing certain records pursuant to the recent decision of the New York Court of Appeals in Matter of State of New York v Floyd Y. (22 NY3d 95 [2013]). That application is opposed by the State and for the reasons outlined below is denied. The respondent also moves to have this court appoint a second expert psychologist or psychiatrist to review the respondent’s condition. That application is also denied.[1]
Application to Preclude State’s Expert from Reviewing Certain Records
The records the respondent seeks to prevent the State’s expert from reviewing were recently ordered unsealed by this court without objection and primarily concern a criminal *340 complaint alleging that he engaged in forcible anal sexual conduct with a male patient at the Manhattan Psychiatric Center on two occasions while Mr. F. was also confined as a patient there in 2013. Mr. F. was subject to the instant proceeding at the time. Certain records also allege that there were additional instances of sexual abuse against the same complainant over a two-week period. An indictment charging Mr. F. with these crimes was never filed and the case was subsequently dismissed for reasons which are not clear. Although the State’s counsel possesses these records, the respondent seeks to prevent the State’s expert from seeing them because the respondent submits these records could not be repeated to a factfinder pursuant to the Floyd Y. decision and might not even be permitted to be relied upon by that expert in arriving at his professional opinion.
Floyd Y. addressed the extent to which an expert witness could recite otherwise inadmissible hearsay information to a factfinder during a trial in order to explain the basis of the witness’s opinion.[2] The Court held that “basis hearsay” could only be admissible in an article 10 trial if it was reliable and if its “probative value in helping the jury evaluate the [expert’s] opinion substantially outweighs [its] prejudicial effect.” (22 NY3d at 109 [citation omitted].) The Court reversed a trial court finding that the respondent suffered from a mental abnormality under article 10 because it found the State’s expert had repeated inadmissible and prejudicial basis evidence concerning sexual assault allegations against the respondent for which he had been acquitted or for which no criminal charge *341 had been brought.[3] In the instant case, the evidence which is the subject of the instant motion resulted in an initial criminal charge but not a conviction or acquittal. The Court in Floyd, Y held that similar evidence in that case, criminal charges of sexual abuse which resulted in neither conviction nor acquittal, required “close scrutiny” and had “sufficient reliability” to weigh in favor of admission but that the “better course” in the case would have been for the court to require the live testimony of the declarant. (22 NY3d at 110.)
The Court in Floyd Y did not explicitly address or change any of the underlying rules applicable to the closely related issue of the extent to which an expert witness may rely upon otherwise inadmissible basis evidence in forming an opinion.[4] As discussed infra, the extent or the manner in which the underlying rationale for the Floyd Y case may eventually lead those rules to be changed remains unsettled. Even assuming those rules are changed by Floyd Y, moreover, there are sound reasons for not having courts initially screen the information an expert may review in forming an opinion in an article 10 case.[5]
Current Rules Regarding Expert Reliance on Basis Evidence
The rules governing the sources of information an expert can rely upon in forming a professional opinion were well established prior to Floyd Y. and will be outlined here. Traditionally in New York, expert witnesses were limited in providing opinions at a trial to relying upon facts in the record or facts personally *342 known to the witness. (Cassano v Hagstrom, 5 NY2d 643 [1959].) The liberalization of that traditional rule culminated in the Court of Appeals decision in People v Sugden (35 NY2d 453, 459 [1974]) where the Court defined the parameters of what is now called the “professional reliability exception” to the traditional rule. Under that exception, an expert can also “base his opinion on material not in evidence, provided the data relied upon is of the kind ordinarily accepted by experts in the field” (id., citing what was, at the time, the proposed new Fed Rules of Evid rule 703). The Court also held that an expert could rely upon material which did not qualify under that exception but which came from a witness who was subject to cross-examination during the trial. (See also People v Stone, 35 NY2d 69 [1974].) Thus, under current law, an expert may generally rely upon the following four sources of information in forming and relaying a professional opinion:
- Facts personally known to the expert witness;
- Facts in the trial record;
- Facts which come from a witness subject to cross-examination at the trial; or
- “[Mjaterial not in evidence, provided the data relied upon is of the kind ordinarily accepted by experts in the field” (the professional reliability exception).
The Court of Appeals outlined an additional important requirement applicable to the professional reliability exception in Hambsch v New York City Tr. Auth. (63 NY2d 723, 726 [1984]). There, the Court held that “[i]n order to qualify for the ‘professional reliability’ exception, there must be evidence establishing the reliability of the out-of-court material” (citations omitted).
The Third Department in Borden v Brady (92 AD2d 983 [3d Dept 1983]) articulated a third limitation on the reliance upon basis evidence in a decision which has since often been cited by other courts or during arguments on the proper scope of expert testimony. In Borden, the Court held that otherwise inadmissible information relied upon by an expert pursuant to the professional reliability exception must not be “the principal basis for the expert witness’ opinion on the same issue” but could only be “a link in the chain of data upon which that witness relied.” (See also Anderson v Dainack, 39 AD3d 1065 [3d Dept 2007].) Thus, the professional reliability exception has three elements:
1. The information relied upon by the expert must be of a kind ordinarily accepted by experts in the field in forming a professional opinion;
*343 2. There must be evidence establishing the reliability of the information; and
3. The out-of-court material must not be the principal basis for the expert’s opinion but rather a link in the chain of data upon which the witness relied. (See generally Matter of State of New York v J.A., 21 Misc 3d 806 [Sup Ct, Bronx County 2008, Riviezzo, J.] [discussing the application of the professional reliability exception in article 10 cases].)
In Floyd Y., the Court alluded to this established case law noting that “we have held that hearsay may play a role in an expert’s testimony because the expert may base an opinion on hearsay if it 'is of a kind accepted in the profession as reliable in forming a professional opinion’ ” (22 NY3d at 107 [citation omitted]).
The Impact of Floyd Y. on the Professional Reliability Exception
One commentator recently opined that the result in Floyd Y. was a “puzzlement” because while holding that the repetition of inadmissible basis evidence by the State’s expert in the case was error, the Court did not find fault with that expert’s overall opinion which was based in part on that same improper evidence.[6] This court does not see any anomaly in that aspect of the Floyd Y. decision. The State’s expert in Floyd Y. might well have reached a conclusion that the respondent suffered from a mental abnormality even without considering inadmissible basis evidence by relying upon the much more extensive evidence supporting the respondent’s mental abnormality which the Court found had been properly recited to the jury. Given the Court’s reversal of the judgment based on the improper recitation of basis evidence, a review of whether the expert’s overall conclusion might be invalid for the same reason would not have changed the result.
The commentator, Professor Timothy M. Tippins, and the respondent here, however, both raise an important issue: the question of how, if at all, the Floyd Y holding will modify the rules governing the information sources experts may use in arriving at their professional conclusions. The new evidentiary rules announced by Floyd Y were based on an analysis of the requirements of procedural due process as outlined in the seminal United States Supreme Court decision in Mathews v Eldridge (424 US 319 [1976]). The Mathews template evaluates whether *344 an adjudicatory rule or process meets the requirements of procedural due process by the application of a three-part balancing test. The three considerations used are the private interest of the litigant, the risk of erroneous deprivation of a right in the absence of substitute procedures and the State’s interest in avoiding additional procedures. (Floyd Y., 22 NY3d at 105.)
Prior to Floyd Y the rules (or more accurately the absence of clear rules)[7] governing the extent to which an expert witness could repeat basis evidence to a factfinder under New York law did not explicitly vary based on the type of proceeding in which evidence was presented. Nominally, if not always in practice, the standards governing the question could be presumed to be the same whether the case was a liability claim based on a car accident or a murder prosecution. The application of the Mathews test to what was previously analyzed primarily as a question of evidence law, however, may well now mean that such consistency no longer exists.
It is difficult to understand how considerations like the interest of a litigant or the risk of an erroneous deprivation of a right in the absence of substitute procedures could now possibly lead to consistent evidentiary rules when a civil personal injury claim was considered rather than, for example, a sex offender civil management case. The private interest of a defendant in a personal injury suit is avoiding money damages. A sex offender civil management respondent, on the other hand, faces potential lifetime confinement. As the Mathews court observed, “[d]ue process is flexible and calls for such procedural protections as the particular situation demands.” (424 US at 334 [internal quotation marks omitted].)[8] Indeed, it is difficult to know whether Floyd Y. will be used to make arguments that a range of other evidentiary rules should also differ depending upon what kind of proceeding those rules are applied to. If the repetition of basis evidence must be analyzed by applying a *345 constitutional due-process balancing test, then why, it might be asked, should not the same template be used to assess other important questions of evidence law?
The Mathews test was originally developed to determine the procedural safeguards required before persons could be deprived of property.[9] The test is not normally used, however, to determine the general rules governing discrete issues of evidence law.[10] The use of the Mathews test to analyze the proper rules for the recitation of basis evidence in article 10 cases is understandable because such evidence in article 10 trials is pervasive, often the most significant evidentiary issue which arises during a trial and obviously implicates a respondent’s fundamental right to procedural due process. The extent to which the Mathews template will be used to assess basis evidence in other kinds of proceedings, however, is less clear.
Similarly, it is not clear how the Court’s new rules governing the admissibility of basis evidence will apply to the professional reliability exception. That is true for two reasons. First, the elements of the two formulations are different. When considering the admissibility of basis evidence, courts must review whether the evidence is reliable and whether its probative value in helping the jury evaluate the evidence outweighs its prejudicial effect.[11] When considering the applicability of the professional reliability exception, however, the court must consider whether *346 basis evidence is of a kind generally accepted by experts in the field in reaching a professional conclusion, whether the information is reliable and whether the basis evidence is the primary support for the expert’s conclusions or merely a link in the chain of data which led to a finding.
Even with respect to the one factor which is common in the two inquires, the issue of reliability, it is not clear whether the application of the Mathews test would lead to the same result. This again is because of the factors the test considers. In Floyd Y., for example, the Court found that an uncharged accusation of sexual abuse against the defendant could not be repeated to the jury because, applying the Mathews test, the Court found that accusation was not sufficiently reliable. A consideration of the second Mathews factor, however, “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards,”[12] might lead to an entirely different result when what was being considered was the use of that same allegation as one of multiple pieces of information which an expert used to form a professional opinion. Given the new legal landscape created by Floyd Y., it is not clear how, if at all, the Floyd Y. holding may eventually lead to a modification of the professional reliability exception.
Respondent’s Application to Preclude State’s Expert from Reviewing Records
The respondent’s argument that the court in this case should review the records he is contesting and determine whether the State’s expert can rely upon them before that expert ever sees the records is based on an important concern. Experts in article 10 cases typically review voluminous records about a respondent and then reach an expert conclusion based wholly or in large part on that review. It is incumbent on courts, however, to review the materials an expert has relied upon, determine whether they meet the requisites of the professional reliability exception or are otherwise admissible and preclude an expert from reaching an opinion based on unreliable information. The inherent problem with that exercise is that by the time a court typically conducts such a review, often immediately before the beginning of a trial or the expert’s testimony, the expert will have already incorporated the materials she has reviewed and *347 found reliable into an expert opinion. This court typically conducts hearings with expert witnesses prior to the beginning of their testimony at article 10 trials and then instructs such witnesses after those hearings to both disregard information the court finds is unreliable and not repeat inadmissible basis evidence to the extent such information may need to be shielded from a factfinder.
Limiting the extent to which an expert may repeat basis evidence is not practically difficult. A court must simply decide which basis evidence is inadmissible, instruct attorneys and witnesses not to repeat that information to a factfinder and proceed with the trial. A court’s attempt to reconfigure the overall conclusions an expert has arrived at, however, based on a determination that part of the information the expert has relied upon does not meet the requisites of the professional reliability exception, is a far more difficult exercise. The expert may find it difficult or impossible to extract the prohibited information from a long-established conclusion and then reconfigure that conclusion without that information. The expert may be biased in favor of his original conclusion. That bias may not be able to be effectively recognized or regulated by a court. If a witness does change his overall conclusion on the eve of a trial based on a court’s ruling excluding certain evidence from being considered in forming an opinion, on the other hand, the trial may have to be postponed. Judges may be subject to similar biases.
The respondent proposes an alternative with respect to the records at issue here: a review by the court in the first instance of whether such records are reliable so that the State’s expert never sees records the court might eventually exclude from the witness’s consideration. That would eliminate the problems inherent with the approach this and other courts now use but, in this court’s view, would create a different and insurmountable barrier. The primary problem with such a prescreening approach would be that the court would never be able to consider the opinion of the expert witness as to whether the contested records met the requirements of the professional reliability exception.
As this court outlined supra, the professional reliability exception can be conceptualized as having three elements. With respect to the first element, the requirement that basis evidence be of a kind generally accepted in the profession, it is essential to consider the testimony of the expert who reviews the record. That does not mean that a court must accept the expert’s *348 conclusions. But the expert’s opinion should at least be heard. It would certainly be possible to simply describe the contents of a record to an expert, ask the expert whether the record met this first requirement of the professional reliability exception and then make a decision. The expert’s opinion would obviously be most informed on this point, however, only if the expert actually reviewed the record.
It would be impossible to determine whether the third requirement of the professional reliability exception would be met without considering the testimony of an expert: whether the basis evidence was the principal ground for the expert’s opinion or simply formed a link in a chain of data leading to the witness’s findings. Even the second requirement of the professional reliability exception, that the information be reliable, would be difficult to assess without an expert review of the records in question. Reliability, in this court’s view, is primarily a question for the court, rather than the expert. An expert witness in an article 10 case will generally not be in a better position to assess the reliability of a particular record than a court. Indeed a court which is in the daily business of assessing the reliability of evidence under a broad range of circumstances may often be more qualified than an expert to make such a determination. The expert, however, will usually have a much greater scope of knowledge about a respondent’s condition and the role a specific record might play in understanding it than a court. The expert might know, for example, about whether an allegation in a record was corroborated by other information among thousands of pages of documents which the court might not be aware of. Even with respect to the question of reliability, then, it is vital to understand the expert’s opinion about whether a record might be properly considered.
Having courts screen records an expert might be able to review in initially forming an expert opinion would also create logistical burdens which could end up significantly impairing the ability of both the State and respondents to effectively prepare their cases for trial. Article 10 cases are already routinely subject to extensive and highly problematic delays for a variety of reasons. The Floyd Y. case itself has been pending for more than eight years. The information an expert can rely upon and repeat to a factfinder during an article 10 trial is now regulated in three respects. First, the information which the State or a respondent may obtain through discovery may be limited and subject to restrictions by the court. The extent to *349 which an expert can form a conclusion by relying upon such information is regulated. Finally, the extent to which an expert can repeat basis evidence is subject to restrictions.
Having courts monitor the extent to which attorneys for the State or respondents could provide materials they had obtained to their experts could also create situations where an attorney would have more information about a respondent’s condition than the expert witness upon whom the attorney’s case relied. This could create obvious barriers in the communications and strategic thinking the attorney and the expert would otherwise fully engage in to prepare for trial.
The allegations at issue here: that the respondent committed a series of brutal sexual assaults in the recent past while confined in a psychiatric institution awaiting the instant trial are very significant and supported by multiple records. The extent to which these allegations are supported by corroborating evidence other than the assertions of the complainant and ultimately whether these allegations might be used or recited by the State’s expert during the respondent’s trial, however, are questions which have not yet been determined. Before ruling on these issues, the court would like to hear from the experts. To provide a fully informed opinion, in turn, the experts will have to review the records. There certainly may be situations in which an application like the one made by the respondent here might be appropriately granted. But the court does not think such a circumstance exists here. For all of those reasons, respondent’s application to prevent the State’s expert from reviewing these materials is denied.
Application to Appoint Second Respondent Expert
The respondent also moves to have this court appoint a second expert witness to examine the respondent and opine on his condition. The court previously appointed Dr. Scroppo upon the respondent’s application to examine him. Mr. F. was represented by a different attorney than his current counsel at the time. The respondent asserts that Mr. F. wants a second expert because Mr. F. is concerned about the accuracy of some of the information Dr. Scroppo placed in the 40-page report he prepared on the respondent’s condition in 2011. The court suspects that the more significant issue for the respondent may be that Dr. Scroppo in his report opined that Mr. F. suffers from a mental abnormality under article 10, although Dr. Scroppo also opined that abnormality is not sufficient to warrant Mr. F.’s *350 confinement rather than strict and intensive supervision and treatment (SIST) in the community.[13]
Article 10 clearly provides for the court to appoint only one expert upon the respondent’s motion to examine the respondent and opine on his condition, with the costs of that evaluation paid by the State. (Mental Hygiene Law § 10.06 [e].) There certainly may be circumstances under which a second expert might examine or testify for a respondent in an article 10 case. An expert appointed on behalf of a respondent, for example, might become incapacitated in which case, in this court’s view, a respondent might be entitled to the appointment of a second expert. In this case, Mr. F. previously sought to hire a second expert witness using his own funds and this court, over the State’s objection, opined that he would have the right to do that. However, Mr. F. apparently never retained a second expert. Given the fact that Dr. Scroppo’s report was prepared in 2011, he would certainly be authorized to update that report and modify his conclusions if he thought that was appropriate. The representations made by the respondent in this case, however, in the court’s view, do not justify the appointment by the court of a second respondent’s expert to examine Mr. F. and opine on his condition. The respondent’s application for the court to appoint such an expert is therefore also denied.

. This court issued these rulings in a brief bench order on April 22, 2014 with an indication that the instant decision would follow.

. While characterizing such so-called “basis evidence” as hearsay throughout its opinion, the Floyd Y. majority also asserted that “basis hearsay does not come into evidence for its truth, but rather to assist the factfinder with its essential article 10 task of evaluating the experts’ opinions.” (22 NY3d at 107.) The question of whether such evidence is hearsay may have significant implications apart from how such evidence is treated in article 10 cases. Most obviously, that determination may be dispositive on the question of whether basis evidence offered in criminal cases may violate the Sixth Amendment’s Confrontation Clause. (See Williams v Illinois, 567 US —, 132 S Ct 2221 [2012]; compare Floyd Y., with People v Goldstein, 6 NY3d 119, 128 [2005] [describing the contention that basis evidence is not offered for its truth as a “factually implausible, formalist claim”].) The concurring opinion in Floyd Z and five Justices of the United States Supreme Court in Williams agreed with the Goldstein court’s conclusion on the issue. (See Floyd Y [Smith, J., concurring]; Williams [Thomas, J., concurring; Kagan, J., dissenting].)

. Most article 10 trials focus solely or primarily on the question of whether the respondent suffers from a mental abnormality, defined as “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i].) A respondent’s sexual offense history is always an important part of the evidence which is presented during an article 10 trial.

. See Floyd Y., 22 NY3d at 116 (Smith, J., concurring) (“The majority opinion in this case says little about the hearsay rule and the professional reliability exception as they are generally applied in civil and criminal trials”).

. This court did not preside over the jury trial in Floyd Y. but presided over the case prior to the trial and currently presides over the case, after remand from the Court of Appeals. A new trial date in the case has not yet been scheduled. This court has issued two decisions in the Floyd Y. case, both denying the State’s motion to change the venue of the trial from New York County to Oswego County. (See Matter of State of New York v K.B., 20 Misc 3d 1110[A], 2008 NY Slip Op 51312[U] [Sup Ct, NY County 2008]; Matter of State of New York v Floyd Y., 43 Misc 3d 1202[A], 2014 NY Slip Op 50454[U] [Sup Ct, NY County 2014].) References to the Floyd Y. case in the instant decision are to the Court of Appeals holding rather than the instant court’s decisions.

. See Timothy M. Tippins, Predicate Perplexity: The Case of ‘Floyd Y.’, NYLJ, Jan. 10, 2014.

. In its 2005 Goldstein decision, the Court of Appeals noted that it was “not called upon to decide here, and do[es] not decide” whether the rules governing the admissibility of basis evidence were the same, more restrictive or less restrictive than the rule governing the same question under the Federal Rules of Evidence (rule 703). (6 NY3d at 127.) The question left open by Gold-stein remained unanswered until Floyd Y.

. Mathews has been described as an example of an “ad hoc” constitutional balancing test, that is, a balancing test which will lead to a different result depending on the proceeding it is applied to rather than a “definitional” balancing test which creates broad rules of general application. (See T. Alexander Aleinkoff, Constitutional Law in the Age of Balancing, 96 Yale L J 943, 948 [1987].)

. See Floyd Y., 22 NY3d at 119-120 (Smith, J., concurring).

. A cursory review of the alphabetical listings of thousands of case citations supporting two leading treatises on New York evidence law, for example, does not reveal a single citation to the Mathews decision. (See Prince, Richardson on Evidence [Richard T. Farrell 11th ed 1995] [the 11th edition also contains a 2008 supplement but that supplement does not contain a case index and was not considered here]; Michael M. Martin, Daniel J. Capra & Faust Rossi, New York Evidence Handbook [2d ed 2003 & 2006 Cum Supp].)

. As Judge Smith observed in his concurring opinion in Floyd Y., where the facts of a respondent’s prior alleged crimes are important and are inadmissible other than through basis evidence, the prejudice vs. probative value assessment may be difficult to apply. The inquiry considers whether the probative value of basis evidence in helping a factfinder understand the basis for an expert’s opinion, substantially outweighs the prejudicial effect of that evidence. The prejudicial effect arises from the tendency of the factfinder to accept basis evidence for its truth. Basis evidence like that offered in the typical article 10 case involving a respondent’s prior alleged crimes, however, is usually only relevant if it is assumed to be true. Absent an acceptance of such evidence for its truth, it usually has no relevance. “The probative value of the statements thus is inseparable from, and cannot outweigh, their prejudicial effect.” (Floyd Y., 22 NY3d at 115-116 [Smith, J., concurring].) The difficulty of applying this formulation may lead courts to improperly equate “probative value” with reliability and “prejudicial effect” with unreliability and use the *346 test simply to determine whether proffered basis evidence is sufficiently reliable. {Id. at 114.)

. Mathews, 424 US at 335.

. If a jury (or the judge in a bench trial) determines that a respondent suffers from a mental abnormality under article 10, then the court makes a subsequent decision about whether the respondent should be confined in a secure mental health facility or released to a regimen of SIST in the community.