[7 NYS3d 866]

In the Matter of STATE OF NEW YORK, Petitioner, v J.R.C., Respondent.

Supreme Court, Livingston County, February 25, 2015

## APPEARANCES OF COUNSEL

*Mental Hygiene Legal Service* (*Kristin Dawson Henderson* of counsel) for respondent.

*Eric T. Schneiderman, Attorney General* (*Wendy Whiting* of counsel), for petitioner.

## OPINION OF THE COURT

ROBERT B. WIGGINS, J.

In this proceeding pursuant to article 10 of the Mental Hygiene Law, respondent moves, inter alia, to preclude the State's experts from using various records in forming their opinions as to whether he suffers from a mental abnormality. He bases this application on the Court of Appeals decision in *Matter of State of New York v Floyd Y.* (22 NY3d 95 [2013]) as well as cases interpreting the "professional reliability" exception to the hearsay rule, in particular those dealing with the reliability of material that an expert may rely on in forming a professional opinion—so-called "basis evidence" (*see e.g. Hambsch v New York City Tr. Auth.*, 63 NY2d 723 [1984]; *Wagman v Bradshaw*, 292 AD2d 84, 87 [2d Dept 2002]). For the following reasons, the court denies the motion.

In the recent case of *Matter of State of New York v William F.* (44 Misc 3d 338 [Sup Ct, NY County 2014]), the court denied a similar motion by a respondent in an article 10 case. Judge Conviser in that case reviewed the case law on the professional reliability exception, as well as *Floyd Y.*, and concluded that, while the reliability of evidence upon which an expert bases his opinion is "primarily a question for the court," the input of the experts themselves on this question "is vital" (*id.* at 348). While this court is not in full agreement with the analysis in *William F.*, it is in full agreement with that court's conclusion that the question of what records experts may properly rely upon in forming their opinions can not be answered without input from the experts themselves.

At the outset, it is important to differentiate between the concept of reliability as delineated in *Floyd Y.*, and the concept of reliability in the context of the professional reliability exception. *Floyd Y.* dealt only with the issue of the extent to which the basis of an expert's testimony could be put before the jury.

It did not even purport to deal with the question of what material *not* disclosed to the jury may properly be relied upon in forming an expert opinion. That differentiation requires some discussion of the historical backdrop of the professional reliability exception.

Historically, experts at trial could base their opinions only upon evidence in the record, or evidence personally known to them (*see Cassano v Hagstrom*, 5 NY2d 643 [1959]). This created a conflict, because experts, in plying their own trades, often relied on material that would not be admissible in a court of law, including hearsay statements that they, in their field, determined were reliable enough to base their opinions on. Thus, an expert in court could not base his opinion on the same material that he would use in formulating his opinion in his field of work.

Courts and commentators had noted this conflict for some time; indeed, as early as 1897, the Second Circuit allowed an expert to base his opinion on facts contained in a learned treatise (*Western Assur. Co. of Toronto v J.H. Mohlman Co.*, 83 F 811 [2d Cir 1897]), a ruling that the Harvard Law Review considered "an entirely novel point," which "ought to attract considerable notice" (Note, *Scientific Books as Evidence*, 11 Harv L Rev 332, 332 [1897]). Recognizing the conflict, by the early 1970s a growing minority of jurisdictions had liberalized the rule with regard to basis evidence (*see* Edward J. Imwinkelried, *The New Federal Rules of Evidence—Part II*, 1973-May Army Law 1, Dept of Army Pamphlet 27-50-5; Proceedings of the Thirty-Fourth Annual Judicial Conference of the District of Columbia Circuit, 61 FRD 147, 219-220 [1973]). Federal Rules of Evidence rule 703, which was adopted along with the original Federal Rules of Evidence in 1975, adopted the then minority rule, providing that, in formulating their opinions, experts could use outside evidence, even if it would "not be admissible in evidence," so long as it was "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" (Fed Rules Evid former rule 703, as added by Pub L 93-595, 88 US Stat 1926).

In 1974, the Court of Appeals, clearly influenced by federal rule 703, which was in the proposal stage at the time, adopted the same rule in New York, in *People v Sugden* (35 NY2d 453 [1974]). The *Sugden* Court formulated what would come to be known in New York as the professional reliability exception thusly: an expert "may rely on material, albeit of out-of-court

origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion" (*id.* at 460). The question of what is considered "*reliable* in forming a professional opinion," and the related question of how much of a gatekeeping role the court assumes in making this determination, are ones upon which various courts have come to differing conclusions. Professor Michael Graham, in his commentary in the Handbook of Federal Evidence, says that "courts are loosely divided into two camps" in this regard—the "restrictive" camp and the "liberal" camp (Michael Graham, Federal Evidence § 703:1 n 14 [7th ed 2014]). Both camps "agree that the trial judge must decide whether the data on which the expert relied is of a type reasonably relied upon in his field of expertise" (*id.*). Under the "liberal approach" (*id.*), there is no further inquiry made; if the judge determines that experts ordinarily rely upon any given outside data in forming an opinion—which determination can, and normally is, based largely upon the opinion of the experts themselves—then no further inquiry is made as to the underlying reliability of the outside data. By contrast,

> "the restrictive camp imposes a further requirement: it reassesses the underlying material to determine whether it would have been excluded as hearsay for reasons bearing on reliability, and if so finds that the expert could not reasonably have relied on it, even though [the expert] shows that this is the type of material on which he relies in his nontestifying, working life" (*id.*).

Another commentator refers to the "liberal" approach as the "limited gatekeeper" approach, and the "restrictive" approach as the "active gatekeeper" approach (*see* 29 Charles Alan Wright and et al., Federal Practice and Procedure Evidence § 6274 [1st ed]). Respondent urges the court to utilize the restrictive, or active gatekeeper approach, while the State advocates for the liberal, limited gatekeeper approach. Both approaches find support in New York case law.

The respondent urges that the Court of Appeals, in *Hambsch* (63 NY2d at 726), decided this issue in favor of the restrictive approach. While *William F.* appears to support that position (*see* 44 Misc 3d at 342), this court disagrees. In *Hambsch*, the Court said only that "[i]n order to qualify for the 'professional reliability' exception, there must be evidence establishing the reliability of the out-of-court material" (63 NY2d at 726). On its face, this statement does not impose any additional requirement not found in the *Sugden* formulation, which likewise

stated that, in order to serve as the basis for expert testimony, the material at issue must be "accepted in the profession as *reliable*" (*Sugden*, 35 NY2d at 460 [emphasis supplied]). *Hambsch* merely emphasized the "reliability" aspect of the rule; it offered no guidance as to how such reliability was to be shown—i.e., whether anything more than acceptance as reliable in the expert's field was necessary. Indeed, the basis evidence at issue in *Hambsch* was so patently unreliable that the Court could easily have concluded as a matter of law that no expert would reasonably rely upon it.

The Second Department, on the other hand, has planted itself firmly in the restrictive, active gatekeeper camp. In *Wagman v Bradshaw* (292 AD2d 84, 91 [2d Dept 2002]), the Court held that the trial court

> "committed reversible error in permitting the plaintiff's expert, who presented the only medical testimony offered on the plaintiff's case-in-chief, to testify as to the interpretation of MRI films, as set forth in a written report of a nontestifying health-care professional, for the truth of the matters asserted in the report."

This holding appears to have more to do with the *Floyd Y.* question of how much underlying basis testimony can be introduced in evidence than to the question of whether such material is reliably relied upon by experts in forming their opinion. However, in very strong dicta on the latter question, the Second Department stated that "we also take this opportunity to reiterate the requirement that, '[i]n order to qualify for the "professional reliability" exception, there must be evidence establishing the reliability of the out-of-court material'" (*id.* at 89). The Court further said that

> "[t]o the extent that prior cases from this Court have not limited application of the 'professional reliability' basis for opinion evidence to permit an expert witness to testify that he or she relied upon out-of-court material which is of a type ordinarily relied upon by experts in the field to formulate an opinion, and have not required proof that the out-of-court material was reliable, those cases should . . . not be followed" (*id.* at 90 [citations omitted]).

Thus, the Second Department clearly placed itself in the "restrictive camp," stating that the determination of "reliability" constitutes an additional element of the professional reliability exception, above and beyond whether the material is ordinarily

relied upon by experts in the field. In doing so, it specifically abrogated two previous cases—*Torregrossa v Weinstein* (278 AD2d 487 [2d Dept 2000]) and *Pegg v Shahin* (237 AD2d 271 [2d Dept 1997])—which had appeared, at least, to embrace the liberal, limited gatekeeper approach.

The Fourth Department, on the other hand, appears to eschew the restrictive approach in favor of the liberal, limited gatekeeper approach. This is indicated in at least two ways. First, in *Fleiss v South Buffalo Ry. Co.* (291 AD2d 848, 849 [4th Dept 2002]), the Court held that an expert "was properly permitted to testify regarding the reports and findings of non-testifying treating physicians and to the results of a functional capacity examination of plaintiff, because those out-of-court materials are of the kind generally accepted as reliable by experts in the medical profession." On its face, this is an expression of the liberal approach. Moreover, in reaching this conclusion, the Court cited both *Torregrossa* and *Pegg* which, as set forth above, were clearly identified by the Second Department as expressions of the liberal, limited gatekeeper approach. The Fourth Department has continued to cite *Fleiss* even after the Second Department eschewed the liberal approach in *Wagman* (*see LaForte v Tiedemann*, 41 AD3d 1191, 1192 [4th Dept 2007]).

The second indication that the Fourth Department embraces the limited gatekeeper approach comes from a comparison of *Matter of Murphy v Woods* (63 AD3d 1526 [4th Dept 2009]), on the one hand, and *Matter of State of New York v Motzer* (79 AD3d 1687 [4th Dept 2010]) and *Caleb v Sevenson Envtl. Servs., Inc.* (117 AD3d 1421 [4th Dept 2014]), on the other. In *Murphy*, the Court held that it was error to admit a mental health counselor's expert opinion, where it was based, in part, on interviews with collateral sources, and "the collateral sources did not testify at trial, and there was no evidence establishing their reliability" (63 AD3d at 1526). This could, potentially, be read as endorsing the restrictive approach. However, in *Motzer*, the Court allowed expert testimony by a forensic psychologist that was based upon similar interviews with collateral sources, because, in that case, "the expert testified that the [collateral source materials] are commonly relied upon by the profession when conducting a psychological examination to determine whether a respondent is a dangerous sex offender requiring confinement" (79 AD3d at 1688). This is a clear expression of the liberal approach—the trial court ac-

cepted, as it was entitled to, the expert's testimony that the collateral source material was commonly (and reasonably) relied upon by experts in the field, and that was enough—no further inquiry into the reliability of the collateral source material was required by the Fourth Department. Similarly, in *Caleb*, the Fourth Department held that the trial court properly overruled the defendant's objection to the lack of foundation for the plaintiff's expert's opinion, which was based, in part, on measurements contained in a report not admitted in evidence. The Fourth Department said that where "the expert testified that the information on which he relied was of the type relied on in his profession," the defendant's objections were "properly overruled" (117 AD3d at 1422). Again, no further inquiry into the underlying reliability of the data was undertaken.

This court, of course, is bound by Fourth Department precedent. Accordingly, the court holds that, so long as there is evidence establishing that materials are commonly and reasonably relied upon by experts in the field in forming a professional opinion, those materials may serve as a basis for the expert's opinion. This is not to say that this court will automatically accept any given expert's opinion with respect to whether any particular material is relied upon in the profession. If such material appears inherently unreliable, or there are conflicting opinions from other experts as to what material is properly relied upon, the court may reject an expert's testimony in this regard. However, clearly the expert's view of what is properly relied upon by experts in his profession is highly relevant, and it may, in a proper case, be deemed determinative. Accordingly, it would be entirely inappropriate for this court to make a determination of what materials the State's experts may review, prior to the experts themselves reviewing them and determining whether they believe that the materials are commonly and reasonably relied upon by professionals in their field.

This is also not necessarily to say that there are not additional checks upon an expert's opinion. Even when an expert may properly rely upon an out-of-court document, such as an MRI report, where such report serves as essentially the sole basis for the expert's opinion, the opinion will not be admitted, because "[i]f the witness has gone to only one hearsay source and seeks merely to summarize the content of that source, then he is acting as a summary witness, not an expert" (*United States v Williams*, 431 F2d 1168, 1172 [5th Cir 1970]; *see also Wagman*, 292 AD2d at 87-89 [listing various problems with the

admission of expert testimony based solely on a report prepared by non-testifying physician]). On the other hand, where such material serves as "merely . . . a link in the chain of data," upon which the expert relies, the opinion will be admitted (*O'Brien v Mbugua*, 49 AD3d 937, 939 [3d Dept 2008] [internal quotation marks omitted]).

As an aside, even if this court were to assume that the Fourth Department, like the Second Department, would impose an additional "reliability" component to the professional reliability exception, that test would not be the same one imposed by *Floyd Y.* As set forth above, *Floyd Y.* did not even purport to deal with, much less change, the standard for what material may properly serve as the basis for an expert's opinion. Quite simply, "reliability" in terms of the professional reliability exception almost certainly can not be the same as "reliability" in the *Floyd Y.* context. If it were, then *Floyd Y.* would practically eviscerate the professional reliability exception. *Floyd Y.* deals with the issue of what basis testimony the jury actually gets to hear. In that context, a high degree of reliability is necessary, because of the danger that the jury will accept it not only for its assessment of the expert's opinion—the only reason it ostensibly comes in—but also for its truth. Because of this danger of the jury accepting such material for its truth, the Court in *Floyd Y.* established relatively high standards to ensure that such material is, in fact, true. While surely it is also important that other information upon which experts rely be true and accurate as well, where such information is not disclosed to the jury, there is a lesser degree of certainty necessary. Accordingly, assuming that an expert testifies—and the court agrees—that material such as Sex Offender Registration Act records, parole board documents, presentence reports, accusatory instruments, police reports and case summaries, and victim statements are commonly relied upon by experts in the field, they qualify as material upon which the expert may base his opinion, even if they do not satisfy the more stringent *Floyd Y.* criteria (*see generally Matter of State of New York v Mark S.*, 87 AD3d 73 [3d Dept 2011]).

Accordingly, respondent's motion for a limine ruling precluding the State's experts from relying on the various materials listed in his motion papers is denied. After the State's experts undertake their review and report, and no later than three weeks prior to trial, the State shall identify all materials upon which those experts relied and forward them to respondent.

The court will then entertain any application that respondent may make, whether on papers or by means of voir dire prior to the experts' testimony at trial, to challenge the experts' reliance on those materials in forming their opinions. In addition, at the same time it forwards the material upon which its experts relied in forming their opinions, the State will identify all hearsay that it intends to introduce as basis testimony under *Floyd Y.*, and a hearing to determine the admissibility of such material will be held as well.