OPINION OF THE COURT
Dineen A. Riviezzo, J.
Respondent Kevin F. is the subject of a petition for sex offender civil management pursuant to article 10 of the Mental Hygiene Law. On February 5, 2008, respondent was placed on strict and intensive supervision and treatment (SIST) as a result of his admission, before another judge of this court, that he suffered from a mental abnormality as defined by Mental Hygiene Law article 10.
On March 3, 2014, the State filed a petition seeking revocation of respondent’s placement on SIST and sought an order for civil confinement due to alleged violations of his SIST conditions. On December 12, 2014, respondent filed a petition seeking discharge from SIST, and on July 13, 2015, he filed a motion for summary judgment pursuant to Civil Practice Law and Rules § 3212 based on the Court of Appeals’ decision in the Matter of State of New York v Donald DD. (24 NY3d 174 [2014]). With the parties’ consent, this court held combined hearings on all related issues on August 17, 2015, August 18, 2015, August 20, 2015, August 21, 2015 and October 20, 2015.
Argument of the Parties
In Donald DD., the Court of Appeals ruled that evidence that a respondent suffers solely from antisocial personality disorder (ASPD), together with sexual crimes, cannot be used to support a finding that he has a “mental abnormality,” as defined by the Mental Hygiene Law, when that diagnosis is not accompanied by “any other diagnosis of mental abnormality” (Donald DD., 24 NY3d 174, 196 [2014]). Respondent argues that the petition should be dismissed based on Donald DD. *913 because, in addition to the diagnosis of ASPD, he has been diagnosed with only polysubstance abuse, in remission, and psychopathy which respondent argues are not “independent mental abnormality diagnoses’’ sufficient to support a finding of a mental abnormality under Mental Hygiene Law article 10 (respondent affirmation, motion for summary judgment ¶ 5).
The State argues that it has proved, by clear and convincing evidence, that respondent still currently suffers from a mental abnormality based on the psychiatric examiner’s diagnoses of ASPD, together with psychopathy. The State argues that these diagnoses, taken together, affect the emotional, cognitive or volitional control of respondent and predispose him to the commission of conduct constituting a sex offense resulting in respondent having serious difficulty in controlling such conduct. The State further argues that respondent’s continued violations of his SIST conditions also demonstrate that he poses a significant risk of committing another sexual offense and is a danger to others if not subject to civil confinement. Thus, the State requests that respondent’s SIST be revoked (petition for civil confinement ¶ 13).
The parties agreed to brief the threshold issue for the court’s resolution which is whether psychopathy is a diagnosis independent of ASPD and, if so, whether a psychopathy diagnosis can form the basis of a finding of a mental abnormality as the Court of Appeals has now defined it in Donald DD.[1] The court has considered the petition for civil confinement, and all relevant exhibits, the respondent’s motion for summary judgment, as well as his petition to be discharged from SIST, the hearing testimony and all relevant exhibits and the submissions of both parties upon this motion, and the recent precedent of Donald DD. This court is constrained to follow the opinions of other judges of this court who have also considered this issue and have found that a diagnosis of ASPD and psychopathy, together with evidence of sexual crimes, cannot form the basis of a mental abnormality for the reasons stated in the Court of Appeals’ decision in Donald DD. (See e.g. Matter of State of New York v Maurice G., 47 Misc 3d 692 [Sup Ct, NY County 2015, Farber, J.]; Matter of State of New York v Jerome A., 48 *914 Misc 3d 1229[A], 2015 NY Slip Op 51303[U] [Sup Ct, NY County 2015, Conviser, J.].)
Factual and Procedural Background
On or about October 1, 1990, the respondent was convicted of rape in the first degree, forcible compulsion, two counts, as well as attempted murder in the second degree and robbery in the first degree. Respondent’s maximum expiration date was April 29, 2007. Respondent’s conviction of rape in the first degree qualified him as a sex offender under Mental Hygiene Law § 10.03 (p) in that he was convicted of a felony defined in article 130 of the Penal Law.
On April 27, 2007, the State filed a verified petition seeking an order authorizing civil management of the respondent pursuant to article 10 of the Mental Hygiene Law. Pursuant to respondent’s admission that he suffers from a mental abnormality as defined in Mental Hygiene Law article 10, on or about February 5, 2008, another judge of this court determined that respondent was a detained sex offender requiring civil management, and placed him on SIST, and further imposed the conditions governing his regimen of SIST. On or about February 11, 2008, respondent was released into the community and placed on an SIST regimen under the jurisdiction of the New York State Department of Corrections and Community Supervision.
On or about December 14, 2009, respondent was arrested by the New York City Police Department (NYPD) and charged with unlawful imprisonment in the second degree, assault with intent to cause physical injury, resisting arrest, acting in a manner injurious to a child under the age of 17, menacing and harassment. It is alleged that these criminal charges, as well as the behavior underlying those charges, amounted to violations of respondent’s SIST conditions. In or about January 2010, the State filed an order to show cause and petition for confinement based on respondent’s alleged violation of his conditions of SIST.
Following a hearing pursuant to Mental Hygiene Law § 10.11 (d), another judge of this court determined that the State failed to meet its burden of proving, by clear and convincing evidence, that respondent was a dangerous sex offender requiring confinement. Respondent was again released to the community and placed on SIST.
On or about February 25, 2014, respondent was arrested by the NYPD and charged with forcible touching, assault in the *915 third degree, menacing and harassment. Respondent was subsequently violated on his SIST order. On March 3, 2014, the State filed the current sex offender confinement petition pursuant to Mental Hygiene Law § 10.11 (d) against the respondent based, in part, on respondent’s rearrest. However, these charges against respondent were dismissed when the complaining witness, who initially gave a statement to both the responding police officers and the respondent’s SIST parole officer, ultimately did not cooperate by failing to sign the corroborating affidavit for a misdemeanor information.[2]
On December 12, 2014, respondent filed a petition seeking his discharge from SIST pursuant to Mental Hygiene Law § 10.11 (f). Respondent filed a motion for summary judgement, dated July 13, 2015. Respondent moves for summary judgment pursuant to CPLR 3212 claiming that his motion is predicated on the October 28, 2014 decision of Matter of State of New York v Donald DD. (24 NY3d 174 [2014]).
Hearing Testimony Concerning Psychopathy
The State called two experts, Dr. Frances Charder and Dr. Trevor Floyd, who both are currently employed by the New York State Office of Mental Health (OMH).[3] The respondent called one expert, Dr. Barry Rosenfeld, a forensic psychologist and professor of psychology in private practice. All three experts diagnosed respondent with ASPD and some form of alcohol abuse, in remission, and each testified that respondent tests high in psychopathic traits. Of course the parties’ experts disagreed on whether respondent has a mental abnormality as that term is defined in Mental Hygiene Law article 10. Since it is undisputed by the parties that ASPD alone is insufficient to find that respondent has a mental abnormality under Donald DD. and the State is not arguing that respondent’s diagnosis of alcohol abuse, in remission, is a contributing factor to his mental abnormality, the question for this court is whether psychopathy can form the basis of a finding of a mental abnormality under Donald DD.
*916 All three experts agreed that respondent has been assessed with high levels of psychopathy in the past by evaluators using the Hare Psychopathy Checklist (PCL-R). For example, Dr. Lord, another OMH evaluator, arrived at a score of 32.6 (Floyd tr at 59). Dr. Rosenfeld, respondent’s court retained examiner, scored respondent in the 90th percentile which would be a score of 32 or higher (Floyd tr at 59-60; Rosenfeld tr at 112). Dr. Floyd scored respondent at a 27 (Floyd tr at 60).
Dr. Rosenfeld defined psychopathy as a construct that has been around for longer than 100 years (Rosenfeld tr at 35). It is a term that is
“used to describe a person that has a cluster of personality characteristics that essentially reflect a lack of concern for, an attachment to others, an impulsive style, a kind of irresponsibility. The core is really sort of thought to be a lack of emotional connections, meaningful emotional connection to others. So you don’t feel guilt or remorse when somebody is mistreated.” (Rosenfeld tr at 35-36.)
Dr. Rosenfeld continued that there are other components “like a sensation-seeking component” and an “inability to learn from your mistakes, lack of anxiety response to situations that might be fearful to some people” (Rosenfeld tr at 36). Dr. Rosenfeld testified that “the DSM-5 [Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition] very clearly says, and it’s been known all along that antisocial personality disorder is also known as psychopathy” (Rosenfeld tr at 42). He testified that the diagnosis of ASPD is an attempt to get at the same underlying phenomenon as psychopathy (Rosenfeld tr at 43). He opined that the diagnostic criteria in the DSM-5 for ASPD “is a little bit more concrete and behavioral” than the PCL-R which has more “subjective elements” (Rosenfeld tr at 44). However, he concluded, “they’re both attempting to get at the same underlying phenomenon that we call psychopathy, sociopathy, antisocial personality. It’s really intended to be one construct, one underlying notion” (Rosenfeld tr at 44). Dr. Rosenfeld believes “conceptually” that the terms psychopathy and antisocial personality disorder are synonymous although from a “criteria level, they’re not identical criteria because we measure them differently. But, they’re both attempting to get at the same kind of person” (Rosenfeld tr at 44).
As support for the argument that these two terms are synonymous, Dr. Rosenfeld testified that Dr. Hare published the Hare Psychopathy Checklist in the same year, 1980, that *917 the DSM-III first articulated a diagnostic criteria for ASPD (Rosenfeld tr at 47). The Hare Psychopathy Checklist is more of a “continuum” with 30 points assigned as the cutoff for a finding of psychopathy, while the diagnostic criteria for ASPD in the DSM is less subjective and more behavioral (Rosenfeld tr at 47). Dr. Rosenfeld agrees that personality characteristics exist in clusters or on a spectrum (Rosenfeld tr at 47). He scored respondent at a 32 (Rosenfeld tr at 112).
“They’re getting at the phenomenon of a person with a personality style that is impulsive and risk-taking and doesn’t care much about others and doesn’t feel a lot of remorse or guilt for their actions and doesn’t seem to feel a lot of anxiety or depression in response to external events.” (Rosenfeld tr at 49.)
Dr. Rosenfeld acknowledged that “there are traits on the psychopathy checklist that are not asked or measured in the antisocial personality disorder criteria” that are used in the DSM-5 (Rosenfeld tr at 50). He opined that “one way of thinking about it is if we called someone psychopathic, I guess it’s roughly analogous to saying really, really antisocial” (Rosenfeld tr at 50). “There’s nothing about psychopathy that is specific to sexual deviance and the PCL-R does not assess that” (Rosenfeld tr at 53-54).
The PCL-R is a 20-item checklist that is grouped into two factors. Factor 1 is the “interpersonal and affective traits, the glibness and superficial interpersonal style, the lack of remorse, the lack of empathy, the deceitfulness, the more interpersonal aspects” (Rosenfeld tr at 51-52). According to Dr. Rosenfeld, this factor contains the most subjective aspects. “[T]he second group of traits are sort of the behavioral and lifestyle. So irresponsibility, behavioral problems, juvenile delinquency, the impulsivity” (Rosenfeld tr at 51-52). Factor 2 traits are more aligned to the antisocial personality disorder criteria than the factor 1 traits (Rosenfeld tr at 61; see also Robert D. Hare, Hare Psychopathy Checklist-Revised [PCL-R], Technical Manual at 90 [2d ed 2003]).
The State’s experts similarly defined psychopathy as a pattern of personality characteristics or behaviors. Dr. Floyd testified that psychopathy “involve[s] this pattern of personality characteristics that involves lack of concern for others, willingness to manipulate, to violate the rights of others, and we— more above and beyond that of antisocial personality disorder which attempts to get to the same concept” (Floyd tr at 64).
*918 Dr. Floyd also detailed the DSM-5 diagnostic criteria of ASPD which entails “a pattern of disregard for violation of the rights of others” (Floyd tr at 61). He explained that there are seven specific sub-criteria, but only three of which need to be present for a diagnosis: those include a “failure to comply with social norms with respect to lawful behaviors as indicated by engaging in conduct that is grounds for arrest as well as deceitfulness, impulsivity, irritability and aggressiveness, careless disregards for safety of self or others . . . reckless disregard. Also consistent with irresponsibility and lack of remorse” (Floyd tr at 61). Other indications are a lack of remorse for others as well as disregard for the safety of self and others (Floyd tr at 61).
Dr. Floyd testified that “there has been a lot of debate about the exact relationship between the two,” specifically with regard to the
“degree to which the two concepts share conceptual overlap, and to the degree to which they don’t. It has largely been argued that the diagnosis of antisocial personality disorder gets a certain aspect of psychopathy, namely the tendency to be somewhat of an imp[ul]sive person engaging in irresponsible behavior or criminal behavior; where as psychopathy is traditionally known and does involve necessarily more of an inherent personality nature to it, that antisocial personality disorder doesn’t necessarily capture” (Floyd tr at 64).
Dr. Charder acknowledged on cross-examination that her diagnosis of respondent was ASPD with a qualifier of psychopathy (Charder tr at 160-161) and defined psychopathy as follows:
“Psychopathy is a condition. It is a severe personality construction which is not antisocial personality disorder. It is different in some ways in that it really involves a person’s ability to relate to others whose—the empathy piece is completely missing in most psychopaths and compassion for other(s). It’s a human relatedness absence. It’s like a depth of an absence of human relatedness. So when you have an individual who has the behaviors that are expressed in antisocial type behaviors, and you add to it the lack of human relatedness and superficial emotions of the individual who demonstrates the callous cold nature of psychopathy, you have—you have a diagnosis of ASPD” (Charder tr at 144).
*919 Dr. Hare in his Technical Manual to the Hare Psychopathy Checklist-Revised (PCL-R) reports that “most criminal psychopaths meet the criteria for A[S]PD, whereas most offenders with A[S]PD do not meet the PCL-R criteria for psychopathy” (Robert D. Hare, Hare Psychopathy Checklist-Revised [PCL-R], Technical Manual at 92 [2d ed 2003]). He explains this, in part, by research that has shown that “the DSM diagnosis of A[S]PD taps the social deviance component of psychopathy but misses much of the personality component, whereas each component is measured by the PCL-R” (id.).
Ultimately, this court need not decide whether psychopathy is an “enhanced” form of ASPD, a qualifier or specifier to ASPD, or even a separate construct or condition. All three experts agreed with the broad definition of psychopathy and testified that there was also general agreement in the literature and research that the presence of psychopathy only increases the risk of general criminal behavior and only when psychopathy is present with indications of deviant sexual interest is there a greatly increased risk of repeated sexual criminal behavior. The record is also clear here that respondent has not been diagnosed with, nor was ever noted to have exhibited, any sexual deviance. Dr. Rosenfeld testified that with regard to article 10’s definition of “mental abnormality,” psychopathy does not predispose an individual to commit sex offenses as the “research demonstrates no independent relationship between psychopathy and sex offending” (Rosenfeld tr at 63). However, psychopathy does have a “disinhibiting effect” such that “when sexual deviance is present, then psychopathy increases the likelihood of a sexual re-offense” and “when sexual deviance is not present, psychopathy does not significantly increase the risk of sexual re-offense” (Rosenfeld tr at 63). Further, Dr. Rosenfeld acknowledged that “psychopathy predisposes people to offending of all kinds” (Rosenfeld tr at 64) and that a high score on the Hare Psychopathy Checklist is associated with a predisposition for general criminal offending and an elevated risk of violent and criminal offending (Rosenfeld tr at 110). Nonetheless, in Dr. Rosenfeld’s opinion, a psychopathic person is not more likely to commit a sex offense than any other offense (Rosenfeld tr at 64).
Both Dr. Charder and Dr. Floyd, in essence, agreed that a high PCL-R score is closely and strongly related to general and violent offending and only associated with sexual offending *920 when it is combined with sexual deviancy (Charder tr at 169; Floyd tr at 79, 82). It is worth noting that Dr. Hare concurs:
“Similarly, I have argued that criminal psychopaths are generalized offenders, and that their sexual offenses might result from a strong propensity to violate the rights of others, a lack of inhibitory mechanisms for violence, and an opportunistic approach to life. That is, psychopaths are less likely than other offenders to ‘specialize’ in a particular type of criminal activity. Evidence presented in an earlier section indicated that the PCL-R is less strongly related to a history of sexual offending than it is to a history of general offending and violence.” (Robert D. Hare, Hare Psychopathy Checklist-Revised [PCL-R], Technical Manual at 154 [2d ed 2003] [citations omitted].)
However, Dr. Hare also emphasizes that “one of the most interesting findings to emerge from research on psychopathy and sex offending is the potent effect that the combination of psychopathic features and deviant sexual arousal has on recidivism, including sexual recidivism” (id. at 156). Deviant sexual arousal is defined as “evidence that an offender shows a relative preference for inappropriate stimuli, such as children, rape cues or violence cues” (id. at 156). After summarizing the research in this area, Dr. Hare concludes that “the combination of psychopathy and deviant sexual arousal was predictive of sexual recidivism” (id. at 156).
Legal Conclusion
In Matter of State of New York v Donald DD., the Court of Appeals held that in a Mental Hygiene Law article 10 trial, evidence that a respondent suffers from ASPD cannot be used to support a finding that he has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i), when it is not accompanied by any other diagnosis of mental abnormality (Matter of State of New York v Donald DD., 24 NY3d 174 [2014]). Specifically, the Court concluded that
“[a] diagnosis of ASPD alone—that is, when the ASPD diagnosis is not accompanied by a diagnosis of any other condition, disease or disorder alleged to constitute a mental abnormality—simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary *921 criminal case. ASPD ‘means little more than a deep-seated tendency to commit crimes.’ Its use in civil confinement proceedings, as the single diagnosis underlying a finding of mental abnormality as defined by Mental Hygiene Law article 10, proves no sexual abnormality. It therefore cannot be the sole diagnosis that grounds such a finding.” (Id. at 190.)
In Donald DD. the state experts opined that Donald DD. suffered from ASPD and described the disorder as “characterized by a pervasive pattern of disregard for others and violation of the law.” (Id. at 182.) In addition, two experts opined that Donald DD. suffered from “an extreme form of ASPD known as psychopathy” (id. at 183 n 3).
The Court described that Dr. Kirschner testified for the State in the companion case that ASPD does not “in and of itself” show mental abnormality as defined by Mental Hygiene Law article 10. Dr. Hamill, the State’s expert in Donald DD., conceded that ASPD does not “in and of itself predispose a person to commit conduct constituting a sex offense” (id. at 183-184). Dr. Plaud, testifying for Donald DD., opined that while ASPD can act “in combination with ... a diagnosable sexual disorder” to produce a potent abnormal condition, it cannot “in and of itself. . . predict sexual impulse control” (id. at 184).
Based upon this testimony, the Court opined that even the State’s experts agreed “when pressed” that ASPD alone is not “a condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense” (id. at 190-191 [internal quotation marks deleted]). The Court thus concluded that the “Supreme Court erred in using an ASPD diagnosis, together with testimony concerning Donald DD.’s sex crimes, but without evidence of some independent mental abnormality diagnosis, to ground a finding of mental abnormality within the meaning of Mental Hygiene Law article 10” (id. at 191).
Similarly here, the State’s two experts testified no differently than the State’s experts in Donald DD. with regards to how they concluded that the respondent suffered from a mental abnormality that predisposed him to the commission of sex offenses. When asked by this court, “how did you come to the conclusion that respondent’s psychopathy predisposes him to commit sex offenses?” Dr. Floyd responded:
*922 “Respondent has been found to demonstrate a pattern of psychopathy. He has been found to have a high level of psychopathy. And that does entail this pattern of characteristics that generally can climb one toward all manner of illegal activity or violative behaviors. However, in [respondent’s] case we have seen this history of sex offense. And we have received most pertinently, to my opinion, as to whether he continues to have mental abnormality, this allegation of unwanted sexual contact, this new offense from 2014, and so his behavior during that—during that allegation, this alleged behavior during that alleged incident, does appear consistent with his overall record of behavior including his prior convicted sex offense as well as his other behaviors ... It does appear consistent with those behaviors but also with psychopathy and with his demonstrated high levels of psychopathy.” (Floyd tr at 129.)
Further when asked by the State whether respondent’s high level of psychopathy relates to his sexual offending or “speak(s) to that serious difficulty of committing sexual offenses,” Dr. Floyd concluded
“In [respondent’s] case, I find that it does. . . . [respondent’s] high level of psychopathy has manifested in other ways as well. It does appear to be linked to his prior non-sexual criminal history and other things as well. However, it does appear to have manifested in this sexual way through sexual offenses for [respondent]” (Floyd tr at 121).
When asked by the State how respondent’s “psychopathy relates to him being a dangerous sex offender requiring confinement?” Dr. Charder concluded:
“When sex offenses are primary behavioral expression of either antisocial personality disorder or the trace of psychopathy, and the urge to control those behaviors is not controlled, there are signs that the mental abnormality is still active. So the PCL-R score, which I did not score, would indicate that there is a level of callousness, coldness and that the behaviors were instrumental in attaining whatever goal [respondent] had at that time. And that because of the number of sex offenses, and the aggression toward women that have been noted throughout [respondent’s] life that would indicate *923 that this is a primary way, that his lack of regard and callousness plays out in a sexual way with vulnerable women and violent aggressive moves toward them to obtain sexual gratification.” (Charder tr at 166.)
In essence, the State’s experts concluded that respondent has a mental abnormality based upon respondent’s previous sexual history and a diagnosis which they admitted does not predispose one to the commission of sex offenses. This formulation violates the Court of Appeals’ holding in Donald DD.
Conclusion
As those who practice in this article 10 arena are aware, this court has already held that two diagnoses, paraphilia, not otherwise specified (NOS) (non-consent) and paraphilia, not otherwise specified (sexual attraction to teenage females), are not generally accepted after extensive Frye hearings in those matters held after the Court of Appeals’ expressed concern about the validity of the paraphilia, NOS diagnosis in general. However, here this court respectfully disagrees with the Court of Appeals’ decision with respect to the use of ASPD as a diagnosis to support a finding of mental abnormality.
The respondent here, in this court’s estimation, is a model case for why a diagnosis of ASPD—certainly with a diagnosis of psychopathy—together with a history of sexual offending can certainly form the basis of a mental abnormality. As many courts who have presided over article 10 proceedings can attest to, there is clearly a population of repeat sex offenders—albeit a very small subset[4]—whose ASPD predisposes them to the commission of sexual offending as evidenced by their repeated sexual acts that occur despite repeated sanctions, despite parole restrictions and often as the offenders fail to complete sex offender programs and deny and mitigate their guilt. Respondent committed heinous sex crimes which he still repeatedly denies committing, or, at best, continues to minimize his sexual offending behavior (Rosenfeld tr at 100). As Dr. Rosenfeld explained “the fact that [respondent] has a hard time taking responsibility for his actions, there’s no doubt *924 in my mind that that’s problematic from a clinical standpoint, from a long-term adjustment standpoint. He would do better if he took responsibility for his actions fully” (Rosenfeld tr at 101). Respondent is not generally engaged in the sex offender program he is required to attend, and the program director called his participation “superficial” and respondent, in general, “really sneaky” (Rosenfeld tr at 91).
As for his SIST compliance, even Dr. Rosenfeld conceded, “[respondent] has a very hard time following the rules. People with high levels of antisocial psychopathic traits typically do. He[ ] doesn’t like to follow the rules. I think he feels they’re unfair and he’d like to be able to do what he pleases” (Rosenfeld tr at 78). Respondent forgets to charge his ankle bracelet (Rosenfeld tr at 92), and has done so at least 25 to 30 times over a year and a half period of time (Rosenfeld tr at 103) in an attempt to shield or hide his whereabouts (Rosenfeld tr at 104) and does not tell his parole officer where he is going (Rosenfeld tr at 93). Other testimony demonstrated that respondent’s previous SIST violations included marrying a woman without notifying his parole officers and harassing a former paramour with over 1,200 phone calls in a short period of time after the relationship ended (Charder tr at 101, 105).
As for the 2014 arrest, the best case scenario for respondent is that he brought a pregnant woman he knew to be a prostitute into his bedroom in his aunt’s house late at night in violation of her rules and SIST restrictions and admitted to his parole officer that he was trying to take advantage of her (Rosenfeld tr at 103, 106, 135). In the worst case for the respondent, according to the State, he touched her breast and crotch over her clothing and punched her in the face causing a cut to her lip and swelling to her cheek (State’s summation brief at ¶ 9).
Respondent admits to having anger issues towards women (Rosenfeld tr at 94) as his most recent arrest involved anger at not getting sex with a woman he wanted to have sex with (Rosenfeld tr at 95). As Dr. Rosenfeld conceded, “he’s not good in relationships. People with psychopathic and antisocial personality disorder characteristics typically are not” (Rosenfeld tr at 79). Even Dr. Rosenfeld acknowledged that “it’s probably not an unreasonable characterization that he’s got some issues with women” (Rosenfeld tr at 129).
As a basis for his conclusion that respondent still suffers from a mental abnormality, Dr. Floyd stated that he considered that respondent has not made significant treatment progress, *925 his overall behavior in the community, to what degree he is complying with the expectations of the SIST regimen and specifically any indications of problematic sexual behavior, such as respondent’s arrest and the allegation of sexual violence from 2014 (Floyd tr at 67). Dr. Floyd concluded that diagnoses of ASPD and high level of psychopathy address both prongs of the mental abnormality definition in that
“psychopathy makes it more likely that one would consider illegal behaviors, criminal behavior as a means to an end that is worth pursuing. But also that would make it less likely that it would inhibit that decision to utilize that behavior as a means to an end. Some people would be more likely to experience fear or anxiety when considering engaging in such behavior. It has been found that people with high levels of psychopathy are less emotionally inhibited from pursing that behavior. They are less likely to experience all manner of inhibitions that other people might” (Floyd tr at 68).
He concluded that respondent falls into that “subset” of offenders whose psychopathy manifests itself in the commission of sex offending (Floyd tr at 68).
Most tellingly, even Dr. Rosenfeld testified that respondent has a “reasonable likelihood of committing another criminal offense. And so far my predictions have been true every time with [respondent]. He keeps getting himself in trouble” (Rosenfeld tr at 114-115, 133). While the court agrees with the State that respondent is a dangerous sex offender who will likely re-offend sexually, the Court of Appeals’ ruling in Donald DD. now precludes this court from finding that he presently has a mental abnormality—despite the fact that he initially consented to a finding that he has one.
Accordingly, the State’s petition to revoke respondent’s SIST and civilly confine him is denied. The respondent’s petition seeking discharge from SIST, as well as respondent’s motion for summary judgement, is granted. However, this order is stayed for a two-week period to allow the State to seek a stay of this decision.

. There were various evidentiary issues, such as hearsay and Floyd Y. objections (see Matter of State of New York v Floyd Y., 22 NY3d 95 [2013]), raised during the testimony which the court reserved decision on and the parties have not yet briefed. None of those objections or issues formed the basis of the court’s ruling here.

. As noted above, respondent challenged the reliability of the testimony concerning this offense as the basis of the SIST violation under Floyd Y. (see Matter of State of New York v Floyd Y., 22 NY3d 95 [2013]).

. The State also called Police Officer John Weinum, the responding officer at the February 25, 2014 incident and Parole Officer Ronda Hicks, the partner of Parole Officer Sandra Sutherland who is respondent’s assigned SIST parole officer. The testimony of these witnesses is not relevant to the issues decided here and is therefore not summarized within this opinion.

. My learned colleague Judge Conviser estimated that ASPD has served to subject less than Vio of 1% of the prison population to sex offender civil management (Matter of State of New York v Jerome A., 48 Misc 3d 1229 [A], 2015 NY Slip Op 51303 [U] [2015], citing Matter of State of New York v Michael R., 42 Misc 3d 1222[A], 2014 NY Slip Op 50142[U] [Sup Ct, NY County 2014]).